**HUGHES COMPANY, Inc., a Wisconsin corporation, and Dennis Meitzel and Bank of Madison, Executors of the Estate of William N. Hughes, Plaintiffs,**

v.

**CHISHOLM–RYDER COMPANY, Inc., a New York corporation, and James D. Cota, Defendants.**

**No. C–65–117.**

United States District Court,
W. D. Wisconsin.

July 30, 1969.

As Amended Aug. 18, 1969.

---

(1) * * *

(3) * * *

Joseph G. Werner, Madison, Wis., Carroll B. Callahan, Columbus, Wis., for plaintiffs.

W. T. Doar, Jr., New Richmond, Wis., John R. Schovee, Rochester, N. Y., for defendants.

## FINDINGS OF FACT

JAMES E. DOYLE, District Judge.

*The Parties and Venue*

1. Plaintiff, Hughes Company, Inc. (hereafter sometimes called Hughes Company), commenced this action on September 29, 1965, against defendant, Chisholm-Ryder Company, Inc. (hereafter sometimes called CRCO), for a declaratory judgment holding that United States Letters Patent No. 3,200,945 is invalid as to each of the claims thereof, and that said claims are not infringed by plaintiff.

2. On December 23, 1965, pursuant to stipulation by the parties, James D. Cota, the owner of United States Patent No. 3,200,945, was included as a party defendant by order of the court.

3. On February 3, 1967, pursuant to stipulation by the parties, William N. Hughes, president of plaintiff, Hughes

Company, was included as a party plaintiff by order of the court. Subsequent to trial, Mr. Hughes died and his executors were substituted as parties plaintiff.

4. Hughes Company, Inc., is a Wisconsin corporation having its principal place of business at Columbus, Wisconsin. William N. Hughes at the time he was included as a party plaintiff was an individual residing at Columbus, Wisconsin.

5. Chisholm-Ryder Company, Inc., is a New York corporation, having its principal place of business at Niagara Falls, New York. The individual, James D. Cota, is a resident of Gillett, Wisconsin.

6. Chisholm-Ryder Company, Inc., is the exclusive licensee under U. S. Patent No. 3,200,945 by reason of a license agreement with James D. Cota.

7. The Cota patent in suit issued on August 17, 1965. Plaintiffs were given notice of alleged infringement of the patent in suit by letter dated August 26, 1965. Plaintiffs were advised by said letter that defendants would immediately bring action against plaintiffs or against one or more of the plaintiffs' customers, or against plaintiffs and one or more of plaintiffs' customers, if defendants were not advised within one week from the date of the letter that plaintiffs would cease the alleged infringement.

8. By letter dated September 21, 1965, defendants' counsel gave notice to Stokely-Van Camp, Inc. (hereafter sometimes called Stokely), a customer of Hughes Company, that it was allegedly infringing the Cota patent in suit. Defendants' counsel further advised Stokely that his law firm had been authorized to bring suit against Stokely unless it promptly contacted him for the purpose of negotiating a license agreement. Stokely was advised that defendants' counsel expected to hear from Stokely within three days from the date of the notice letter.

9. An actual controversy existed between plaintiffs and defendants relating to the patent in suit at the time plaintiff Hughes Company filed its complaint praying for a declaratory judgment holding that United States Letters Patent No. 3,200,945 is invalid, and that the claims of said patent are not infringed by plaintiffs.

10. This court has jurisdiction of the subject matter and the parties here involved.

11. On December 6, 1965, defendants herein commenced civil action No. C-65-137 in this court against Stokely, alleging infringement of Cota Patent No. 3,200,945, in suit herein. On January 13, 1967, this action C-65-117 and the companion action C-65-137 were consolidated for purposes of pretrial preparation and for trial, by order of the court.

*Patent in Suit*

12. United States Letters Patent No. 3,200,945 entitled "Bean Separator" were issued on August 17, 1965, upon an application filed October 22, 1962, by James D. Cota, with four claims. Plaintiffs contend that Claims 1–4 of the Cota patent in suit are invalid and void, and are not infringed by the unsnipped bean remover machine manufactured and sold by Hughes Company. Defendants contend that Claims 1, 2 and 3 of the Cota patent in suit are infringed by the manufacture, sale and use of the Hughes unsnipped bean remover machine.

13. Claim 1 of Cota U. S. Patent No. 3,200,945 is directed to a combination of elements for separating snipped beans from unsnipped beans. The elements of the claimed combination include: an open ended cylinder, said cylinder having an inclined axis of rotation with an inlet for snipped and unsnipped beans at its upper end and an outlet for properly snipped beans at its lower end; a multiplicity of fixed fins in said cylinder wall, said fixed fins extending parallel to each other, being evenly spaced, extending longitudinally of said cylinder and defining slots between said fins substantially equal in width to the spacing of the fins, separated substantially only

by the thickness of the fins, and being narrower than the diameter of the beans being separated, the margins of the material when the fins are formed defining edges presented to the material being separated; means for rotating said cylinder to enable the protrusions on the unsnipped beans to catch on the said edges, and be carried towards the upper portion of said cylinder while properly snipped beans without protrusions gravitate along the lower inclined surface of said cylinder towards said · outlet; means, supported independently of said cylinder in the upper half thereof, for engaging unsnipped beans hanging from, and being at least partially supported by said edges to dislodge them from said edges; and means for catching said dislodged unsnipped beans and discharging them from said cylinder separately from the properly snipped beans.

14. Claims 2–4 are dependent upon Claim 1 and include all the limitations of Claim 1. Claim 2 is more specific as to the fins, defining the fins as longitudinally extending fins formed in the cylinder wall and inclined in the direction of rotation of said cylinder. Claim 3 is more specific as to the means included in Claim 1 for catching and separately discharging the dislodged beans from the cylinder, specifying that such means is a conveyor longitudinally traversing the interior of the cylinder, and additionally specifying means for retaining the unsnipped beans on the conveyor as it traverses the cylinder interior. (Claim 4 is more specific as to the means described in the patent specification for dislodging the beans from the edges presented by the cylinder wall, specifying that the means is a brush rotating in the same direction as the cylinder and at a faster rate of speed to deposit the separated unsnipped beans into the catching and discharge means. Defendants concede that Claim 4 is not infringed by the unsnipped bean remover machine manufactured and sold by Hughes Company.)

15. The structures of Cota U. S. Patent No. 3,200,945 resulted from James D. Cota's observations of beans flowing through the plant of Country Gardens, Inc., where he was production manager and secretary. In observing such bean flow he had noted some places in the plant where an unsnipped end of a bean would hang up and become entangled in a protrusion in a conveyor and on another sharp edge or form. Also he noticed that occasionally an unsnipped unit would hang up or attach itself on the perforations in the flat surface of the shaker pan of a nubbin grader, wherein the unsnipped portion of the beans would become entangled in such small holes or openings, making it necessary to brush them off. Based on such observations, Cota thought of the unsnipped ends becoming entangled or enmeshed in a series of entanglements.

16. The first perforated material which Cota selected for engaging and separating beans with protruding stems was louver material available at a local hardware store in Gillett, Wisconsin. A small model in the form of a drum of approximately 18 inches in length and 18 inches in diameter was constructed from such material in 1962. Fresh beans were purchased at a local store and the drum was rotated to determine whether the unsnipped ends of the beans would be entangled in the fins of the louver panel. The result indicated that the unsnipped portions of the beans would become entangled in the fins and be carried upward. Robert Allen of the defendant Chisholm-Ryder Company, Inc., witnessed such a demonstration.

17. After locating a source of available fin material, Cota began construction of an unsnipped bean remover (hereafter referred to as UBR) machine, which was completed on or about July 18, 1962. This machine was substantially similar to the drawings of the Cota patent. It was placed in operation at the Country Gardens plant and used during the 1962 bean canning season. The cylinder wall of the machine was repaired by fastening a section of ¼ inch woven wire mesh screen over a 1¾ inch by 5½

inch hole in the fin-type material of the cylinder wall, and use of the machine was continued.

18. After construction of his first UBR machine, Cota prepared disclosures thereof for submission to his attorneys as a basis for a patent search and application. After reviewing the results of the search, Cota's patent attorneys advised that the general combination of elements of the Cota machine was old. However, they further advised that the particular fin-type panels used in forming the separator drum as proposed by Cota might make it possible to obtain some measure of patent protection.

19. The Cota UBR machine was viewed by several employees of defendant Chisholm-Ryder Company, Inc., including W. E. Carlson, Director of Engineering; Earl McKinley, Sales Manager; Douglas Dankel, Chief Engineer, and Robert Allen. Negotiations were then commenced which resulted, on January 11, 1963, in Cota granting CRCO an exclusive license to manufacture the Cota UBR on royalty basis.

20. The machine manufactured by CRCO was exhibited at the National Canner's Convention in Chicago in January, 1963.

21. Twenty machines were sold by CRCO for use during the 1963 canning season, to seventeen different customers, including Stokely-Van Camp, Inc. Only Cota, who received three said machines for use by his employer, and Hungerford Pkg. Co., which purchased two machines, purchased more than one machine.

22. The first twenty machines sold by CRCO carried no patent number or notice of patent pending at the time of sale. After shipment of the first twenty machines, nameplates bearing the legend "Patent Applied For" were sent to the customers, requesting them to place the nameplates on the machines. There is no evidence whether this request was complied with by the customers. The first unit identified with a "patent applied for" designation notice was ma-chine Serial No. UBR 1021–B, which was the first machine of 93 units built in 1964.

23. Eighty UBR machines were sold by defendant CRCO during the fiscal year ending September 30, 1964, to 22 different customers. Only three prior purchasers of the 1963 machines (Patterson Frozen Foods, Southland Frozen Foods and Stayton Canning Co.) purchased additional machines in 1964.

24. Fifty-two UBR machines were sold by defendant CRCO during the company fiscal year ending September 30, 1965.

25. Thirty-two UBR machines were sold by defendant CRCO during the company fiscal year ending September 30, 1966.

26. Thirty-seven UBR machines were sold by defendant CRCO during the company fiscal year ending September 30, 1967, of which 15 were "regular" units selling for the standard price of $2,625 each, and 22 were the new CRCO Model 500 machines selling for $2,050 ($2,100 with an infeed conveyor).

27. From October 1, 1967, until February 21, 1968, CRCO sold 15 machines, four of which were "regular" units and 11 of which were Model 500 units.

*Plaintiffs' Knowledge of Defendants' Patent and Machine*

28. In December, 1962, William N. Hughes and one of his salesmen, Gunderson, went to see Cota at his home in Gillett, Wisconsin. During the visit Cota showed Hughes preliminary drawings of a UBR and advised Hughes that he had a pending patent application. Hughes told Cota that he was quite interested in the machine but Cota advised Hughes that he was already negotiating with CRCO. Subsequently, when Gunderson made further inquiry as to the status of the patent agreement, Cota told Gunderson that he had signed an agreement with CRCO.

29. Sometime in 1963, William N. Hughes saw the CRCO Bulletin on the

UBR machine which had a notice "(Patent Applied For)" printed on the front page of the bulletin.

30. During the 1963 and 1964 bean canning seasons, William N. Hughes and other Hughes' personnel examined certain of the CRCO UBR machines at the plants of Green Giant Company of Beaver Dam, Wisconsin; California Packing Corp., Markesan, Wisconsin; Durand Canning Co., Durand, Wisconsin; and Stokely-Van Camp, Inc., Scottville, Michigan.

31. It was when he saw a CRCO UBR machine that William N. Hughes was stimulated to conceive his UBR machine.

*The Hughes Unsnipped Bean Remover and the Hughes Patent Application*

32. A drawing dated September 21, 1964, is the first written evidence of a proposed Hughes UBR machine. During September and October, 1964, the first model of Hughes' UBR was constructed. Between December 9, 1964, and December 14, 1964, Hughes Company sold ten UBR machines.

33. On December 1, 1964, William N. Hughes first consulted his patent attorney. A search was made by his patent lawyer to see if there was an issued patent on the CRCO (Cota) UBR machine. No patentability search was made regarding the CRCO UBR and no opinion was rendered regarding the patentability of the CRCO UBR.

34. On December 22, 1964, Hughes' patent attorney examined a CRCO UBR machine at the Hughes plant. Thereafter, on January 21, 1965, Hughes filed his patent application on what ultimately issued July 5, 1966, into United States Patent No. 3,259,241. This patent was disclaimed by the Plaintiffs eleven days before the trial of this case. Vaudreuil U. S. Patent No. 1,364,222 was not cited by the Patent Office, nor brought to the attention of the Patent Office, in connection with the Hughes application. It appears that neither the plaintiffs nor the defendants became aware of Vaud-

reuil until a time subsequent to the issuance of both the Cota and Hughes patents.

35. All of the UBR machines manufactured and sold by Hughes include a cylindrical drum screen of louvered material, a stationary taut wire extending longitudinally adjacent the inner surface of the screen on the descending side of the drum, and an oscillating pan-type conveyor extending longitudinally through the center of the drum. The screen material of the Hughes UBR is fabricated into a cylindrical shape with a multiplicity of louvers of the material directed outwardly with respect to the cylinder wall, thus presenting to the beans being separated a relatively smooth inner surface with rectangular slots. In operation, the projections from the ends of unsnipped beans or bean sections pass through the rectangular slots, are caught upon the leading edges of the louvers, and are lifted out of the mass of beans by the rotation of the drum. As the separated beans near the top of the drum, in most cases, gravity will cause them to fall off the screen, and they are directed by inclined side pans on to a vibrating pan-type conveyor. Those beans which gravity does not cause to fall impinge on the stationary wire on the descending side of the drum, are thereby disengaged from the slots, and are directed by the side pans to the conveyor. The fallen and disengaged beans are then conveyed out of the machine.

36. Hughes Company sold 131 UBR machines during the company's 1965 fiscal year in which its UBR machines were introduced. Hughes Company subsequent sales totalled 112 units in fiscal 1966, 67 units in fiscal 1967, and 86 units during fiscal 1968 up to February 21, 1968.

*Defendants' Knowledge of Plaintiffs' Machine*

37. The Hughes UBR machine was exhibited at the National Canners' Convention at San Francisco, California, on January 24–28, 1965. While exhibited

at the convention, the Hughes machine was examined by Cota, and by CRCO's president, director of engineering, manager of sales, and director of agricultural engineering; the latter took a number of photographs of the interior and exterior of the machine.

### History of Cota Application

38. The Cota Patent No. 3,200,945, in suit, was issued on an application filed on October 22, 1962. As originally filed, the disclosure, claims and drawings of the Cota application were directed to a combination which included an open ended drum formed of circumferentially spaced fins directed inwardly with respect to the cylinder wall. No cylinder construction other than one having fins directed inwardly from the cylinder wall was described in the application. No means for dislodging unsnipped beans from the edges of the cylinder wall material other than a rotatable brush was described in the application.

39. The initial Cota claims were rejected and, after a Patent Office interview, cancelled in favor of a new set of claims. The new claims were presented November 17, 1964, and were characterized as being drawn to a combination including: (1) inwardly directed fins; (2) a rotatable brush for peripheral coaction with the interior of the drum wall; and (3) means for rotating the brush in the same direction as the drum but at a higher peripheral speed to dislodge separated beans from the drum. All three of said structural features were termed "essential" to perform the desired function of the combination. On January 15, 1965, the new Cota claims were again rejected by the Patent Office on the basis of the prior art, including principally Autio U. S. Patent No. 2,869,723, which shows inwardly directed fins in a separator cylinder. The rejection was termed "final".

40. After examining the Hughes UBR machine in San Francisco, defendants arranged another interview with the Patent Office Examiner, and on March 17, 1965, submitted the first of several proposed amendments to the claims intended to cover the Hughes structure. The amendment broadened the language of the claimed fin construction by eliminating the requirement that the fins be "inwardly directed". The amendment also broadened the language of the claims by cancelling the "rotatable brush", "peripheral coaction" and "means for rotating the brush" limitations, so that the independent claims no longer recited any structural limitations relative to the rotatable brush of the Cota machine. The amendment also added the limitation that the fins formed adjoining "slots" of substantially uniform and constant cross-section. It was stated in the remarks accompanying the amendment that the cancelled material did not involve the inventive concept, while the proposed addition related to specified structure which was novel and enabled attainment of desired results. From that point on, defendants argued that only the cylinder wall construction, with emphasis on the slots therein, involved the inventive concept.

41. The examiner refused to enter the amendment on the grounds that the amended claims failed to distinguish patentably over the references, and that it broadened the scope of the claims.

42. Defendants persisted. After they had submitted an affidavit by a CRCO employee and two more proposed amendments, and after a series of phone conversations, the examiner allowed the broadened claims. The feature on which the examiner allowed the claims over Autio 2,869,723, which reference was the basis for the examiner's rejection of the previously submitted arguments that the fins were novel, was:

"Claim 17 and its dependent claims are allowable particularly over the Autio patent because they define the slots between the fins as being:

(1) substantially equal in width to the spacing of the fins;

(2) separated substantially only by the thickness of the fins; and

(3) being narrower than the diameter of the beans being separated."

43. The remarks accompanying the accepted amendment also included the statement that:

"Regardless of whether the fins are struck inwardly as shown in Applicant's drawings or outwardly with respect to the cylinder wall, edges are formed upon which the protrusions on the unsnipped beans are caught or snagged. * * * When the fins project outwardly with respect to the cylinder wall, the protrusions are caught on the edges of the slot or edges formed on the bent fin."

The point of reference employed in the Cota application and file record for determining the direction in which the fins extended was the cylinder wall from which the fins were struck.

44. Defendants did not disclose to the Patent Office that the Hughes UBR had entered the market prior to the offer of the broadening amendments. Nor did they disclose that structural limitations in the claims which had previously been characterized by defendants as "essential" were being cancelled so that the claims would be broadened to read literally on the Hughes UBR structure. Instead, counsel stated that:

"* * * These newly presented claims moreover, fall within the scope of the claims originally presented in this case. * * * It is obvious that the new claims do not contain new matter and that they likewise do not require a further search."

45. The specification and drawings of the Cota patent in suit describe and illustrate only one type of cylinder wall construction, having circumferentially spaced fins directed inwardly with respect to the cylinder wall. The first suggestion in the file history of the Cota patent that outwardly directed fins could be successfully employed to separate unsnipped beans occurred after the Hughes UBR machine entered the market.

46. The only "means" defined in subparagraph (d) of Claim 1 of the Cota patent in suit which is described or suggested in the specification and drawings of the Cota patent is the rotatable brush. There is no suggestion in the Cota patent or the file history thereof that unsnipped beans would be dislodged from the cylinder wall by gravity in the absence of the rotatable brush, or that a simple, stationary wire located adjacent to the descending portion of the cylinder wall would be effective to dislodge from the cylinder wall those unsnipped beans which gravity did not cause to drop off.

47. Defendants did not disclose or urge before the Patent Office the so-called "cantilever" theory. This is a theory that the leading edge of one fin and the trailing edge of an adjacent fin act as "fulcrum" edges to support the stem of a bean in "cantilevered" relation. The theory is not suggested in the Cota patent, or anywhere in the file history of the patent. None of the disclosure material or drawings submitted by Cota to his attorneys or the enlarged drawings of the Cota patent describe or show beans supported by the Cota fins in "cantilever" fashion. The claims of the Cota patent include no limitations on the relative width or angle of inclination of the fins, as compared to the width of the slots between the fins, which would provide the substantially radial relationship between the leading and trailing edges of adjacent fins necessary to obtain the "cantilever" effect. The only functional limitation on the Cota cylinder wall material contained in the patent claims is that when the fins are formed the margins of the material define edges presented to the material being separated, to enable the protrusions on the unsnipped beans to "catch" on the edges and be carried upwards by the rotation of the cylinder. The disclosure of the patent likewise includes no suggestion of the "cantilever" effect or the structural limitations necessary to achieve it. The remarks accompanying the amendment to the Cota applica-

tion which was finally accepted by the Patent Office emphasize that the only functional requirement of the cylinder wall construction defined by Claim 1 is that edges are formed upon which protrusions are caught or snagged, regardless of whether the edges are presented by inwardly struck fins as in the Cota construction or by slots (as in the undisclosed Hughes construction). The "cantilever" effect is not claimed by the patent in suit.

### Scope and Content of Prior Art

48. The prior art which must be considered is the art of separating materials from snap beans or bean sections and the analogous art of separating articles through use of rotating cylinders. The art of perforated materials is also within the field of art which must be considered in determining the validity of the Cota patent.

49. Vaudreuil U. S. Patent No. 1,-364,222 discloses and claims an apparatus for separating tip ends of bean pods from cut intermediate sections comprising a cylinder, the walls of which have a multiplicity of perforations whereby the projections from the tip ends of the beans will be caught thereby and be carried out of the mass of pieces toward the upper portion of the cylinder by the revolution of the cylinder, means in the nature of a pulley and gears to rotate the cylinder in the upper half thereof to engage beans elevated by the cylinder and dislodge them from the edges of the perforations in the cylinder wall, and a trough traversing the interior of the cylinder for catching the dislodged bean sections and discharging them from the cylinder separately from the bean sections without projections which gravitate along the bottom of the cylinder toward the outlet. The brush is located adjacent to the descending side of the cylinder and engages only those beans which do not fall off the cylinder wall of their own accord due to gravity. The cylinder walls are formed of perforate material having perforations of a size to receive the tip extensions only to the end pieces. The patent states that such walls may be formed of woven wire mesh. Two of the 10 claims of the application are limited to that specific perforate material.

50. The Harrington and King Co. Perforated Materials General Catalog Nos. 61 (1940) and 75 (1958) describe the use of perforated materials in the form of screens for cleaning and separating food products, and illustrate that lip slots were well known to the perforating art long prior to 1962. Catalog No. 61 had a circulation of approximately 5,000 copies and Catalog No. 75 had a circulation of approximately 20,000 copies. Catalog No. 75 illustrates at Page 141 a perforated material comprising a multiplicity of rectangular slots with four cut edges in a flat sheet of metal. Page 149 of Catalog No. 75 illustrates the perforate material employed in the Hughes UBR cylinder having a multiplicity of substantially rectangular slots with three cut edges and the fourth side of the slot formed by the outline of the lip or louver bent outwardly from the plane of the base metal.

51. Freeman U. S. Patent No. 2,-672,235 shows circumferentially spaced, inwardly directed fins in a cylindrical drum separator. The fins define slots between the margins of the fins which are substantially equal in width to the spacing of the fins and are separated only by the thickness of the fins, and are of a size to distinguish between the material to be separated and that not being separated.

52. Herbort British Patent No. 508,-170 (Hx–5G, Fig. 7) employs wire of triangular cross-section in a wire mesh cylinder to present to unsnipped beans edges which are oriented in the same way as the leading edges of the Cota fins for the purpose of defining openings to receive and catch the unsnipped ends of the beans.

53. Cadiot French Patent No. 1,053,-468 employs perforated metal to form a cylinder wherein openings or perfora-

442

tions are presented to the unsnipped beans at various angles for the purpose of receiving and catching the unsnipped ends of beans.

54. Brubaker U. S. Patent No. 228,-310 shows rotating brushes for dislodging separated materials from the perforated cylinder of a cylindrical drum separator and directing said materials into a receiving trough.

55. Ryder U. S. Patent No. 1,743,240 shows a conveyor for removing separated materials from a cylindrical drum seperator.

56. Each of said references also discloses means for driving the separator cylinder.

*Invalidity of Claims of Cota Patent*

57. Only Ryder 1,743,240 of the above discussed prior art references was before the Patent Office during prosecution of the Cota patent in suit. The disclosures of the Vaudreuil patent 1,364,222, in particular, and of the other prior art references described above, except for Ryder 1,743,240, are more pertinent to the subject matter of the Cota patent and the distinguishing features clearly incorporated in the claims to obtain the Cota patent than are the references cited by the Patent Office during the prosecution of the application which resulted in the grant of the patent in suit.

(a) *Utility*

58. The combination claimed in the Cota patent is useful.

(b) *Novelty*

59. None of the elements specified in Claim 1 of the Cota patent was new at the time of the alleged Cota invention in 1962, as shown by the above described references. Nor was the combination of said elements in a single apparatus new, in view of Vaudreuil 1,364,222:

| *Cota 3,200,945* | *Vaudreuil 1,364,222* |
|---|---|
| An open ended cylinder having a multiplicity of fins defining slots and edges presented to the material being separated | An open ended cylinder having a multiplicity of perforations and edges presented to the material being separated |
| means for rotating said cylinder to enable the protrusions on the unsnipped beans to catch on the said edges, and be carried towards the upper portion of said cylinder while properly snipped beans without protrusions gravitate along the lower inclined surface of said cylinder towards said outlet; | means for rotating said cylinder to enable the protrusions on the unsnipped beans to catch on the said edges, and be carried towards the upper portion of said cylinder while properly snipped beans without protrusions gravitate along the lower inclined surface of said cylinder towards said outlet; |
| means, supported independently of said cylinder in the upper half thereof, for engaging unsnipped beans hanging from, and being at least partially supported by said edges to dislodge them from said edges; and | means, supported independently of said cylinder in the upper half thereof, for engaging unsnipped beans hanging from, and being at least partially supported by said edges to dislodge them from said edges; and |
| means for catching said dislodged unsnipped beans and discharging them from said cylinder separately from the properly snipped beans. | means for catching said dislodged unsnipped beans and discharging them from said cylinder separately from the properly snipped beans. |

The elements of the combination specified in Claim 1 of the Cota patent perform or produce no new or substantially different function or operation than heretofore produced by the substantially similar elements of the Vaudreuil combination. The Cota patent claims and disclosure describe no new or surprising consequences from the unification of the elements, in view of Vaudreuil 1,364,222.

60. Each of Claims 2, 3 and 4 relates to a specific element of parent Claim 1 which is old in the art, and does not add novelty to the combining of such elements. Claim 2 specifies that the fins in the cylinder wall are inclined in the direction of rotation of the cylinder, which is shown by the Autio Patent No. 2,869,723, relied on by the Patent Office in rejecting the argument by Cota that fins in the wall of the cylinder were novel. Claim 3 specifies that the means of Claim 1 for catching the unsnipped beans and discharging them from the cylinder is a conveyor. Ryder 1,743,240 shows such a conveyor. Claim 4 specifies a rotary brush which is shown by Brubaker 228,310 for performing the same function.

61. The Cota cylinder construction described in Claim 1 is not new. Vaudreuil 1,364,222 described the structure and operation of such a cylinder. The Cota cylinder is constructed of perforate material which was readily available in the market at the time of the alleged invention in 1962. Freeman 2,672,235 shows that the use of inwardly directed fins on the internal surface of a cylindrical drum separator to define slots for performing a size separation function.

## (c) *Obviousness*

62. There is no material difference between the teaching of Vaudreuil 1,364,222 and the combination specified in Claim 1 of the Cota patent. Allowance of Claim 1 was based on defendants' arguments that the slots defined in the cylinder wall distinguished the claimed combination from the cylinder of Autio 2,869,723. Such slots are provided by the specific perforate material taught by Vaudreuil 1,364,222, which was not before the Examiner, as illustrated below:

| *Cota Claim 1* | *Vaudreuil material* |
| --- | --- |
| slots | perforations |
| -substantially equal in width to the spacing of the fins; | -substantially equal in width to the spacing of the wires; |
| -separated only by the thickness of the fins; | -separated only by the thickness of the wires; |
| -being narrower than the diameter of the beans being separated. | -of a size to receive the tip extensions only of the end pieces. |

———◆———

To a food equipment industry engineer, reasonably skilled in the art of separating materials, working in his shop with the prior art references hanging on the walls around him, endeavoring to solve the problem of separating beans and bean sections with stems from bean sections without stems, it would have been obvious to have provided slots in the cylinder wall narrower than the diameter of the beans being separated, with margins defining edges on which protrusions of unsnipped beans would catch and be carried upward, and to have made such slots equal in width to the spacing of the structure defining the slots and to have separated the slots only by the thickness of said structure.

444

63. Claims 2–4 of the Cota patent are not directed to the slots in the cylinder which were believed by the Patent Examiner to distinguish the Cota apparatus. No independent grounds for patentability of Claims 2–4 were urged before the Patent Office. The subject matter of Claims 2–4 would have been obvious to one skilled in the art for the same reasons that Claim 1 would have been obvious. It would have been obvious to one skilled in the art to have combined the subject matter specified in Claims 2–4 with that of Claim 1, in view of the references discussed above.

64. The specific cylinder wall material disclosed in the Cota patent was a well-known perforate material prior to the alleged invention by Cota. The Vaudreuil 1,364,222 disclosure is not limited to the particular perforate material (wire mesh) specifically disclosed therein. The Vaudreuil patent describes two types of material: wire mesh; and perforated material of the type shown in Figs. 2 and 3 of the Cadiot reference wherein openings or perforations have been formed in a sheet. The term "perforated materials" includes the material illustrated at Page 141 of the Harrington and King Perforated Materials General Catalog No. 75 which discloses a multiplicity of rectangular slots with four cut edges in a flat sheet of metal. The Harrington & King Perforating Co. General Catalog referred to perforations in which three sides of a rectangle were cut and the fourth side bent out to form a rectangular slot, as "lip-type perforations". The fabrication of lip slot perforations would produce a slightly stiffer material with greater shape retaining characteristics than material which is perforated by cutting straight through on all sides; such stiffness is desirable in a cylindrical drum of the type described in the Vaudreuil patent. The difference between a perforate material having rectangular slots formed by three cut edges and a bent lip (or louver or fin) and a perforate material having rectangular slots formed by four cut edges is obvious. The louvered perfo-

rations of the Cota and CRCO machines would have been obvious to a person skilled in the art in view of the Vaudreuil patent and in view of the state of the perforate materials art at the time of the alleged invention, as illustrated in the Harrington and King Catalog No. 75.

65. Vaudreuil 1,364,222 refers to the cylinder material as being both "mesh" and "perforate". Expanded metal mesh, which is formed by slitting and stretching, and is frequently described in the industry as "mesh", "steel mesh" and "industrial mesh", has been a well-known perforate material for many years, as shown by White U. S. Patent No. 821,-843 and the 1946 McMaster-Carr Supply Catalog No. 53. Expanded metal mesh is competitive with woven wire mesh and perforated metal, and all three materials have similar end product uses. Expanded metal mesh as employed in the cylinder of the machine constructed according to the Vaudreuil patent is a perforate material within the disclosure of the Vaudreuil patent, and would have been an obvious material to which a person skilled in the art would have looked in constructing an unsnipped bean separator cylinder after reading the Vaudreuil patent. The CRCO cylinder employs expanded metal material of the louver type as expressly defined in CRCO's literature which was readily available on the market at the time of the alleged invention by Cota and would have been obvious to a person skilled in the art in view of the Vaudreuil patent and the state of the art of perforate materials.

66. The combination disclosed in the Vaudreuil patent is operable for the separation of unsnipped beans and bean sections from snipped beans and bean sections with cylinders constructed of woven wire mesh, cylinders constructed of expanded steel mesh, and cylinders constructed with louvered perforations as in the Hughes and Cota-CRCO UBR machines.

67. Operability of woven wire mesh cylinders is also shown by the results of plaintiffs' tests showing such a screen

to be approximately 25 to 30% efficient for the separation of unsnipped beans. Based on the 1963 Stokley report by J. N. Walker, which showed the efficiency of 8 women picking after two snippers to be approximately 36%, a machine capable of efficiencies of 25 to 30% would have significant labor saving potential. A machine operating at 50 to 55% efficiency as did the machine with the expanded metal mesh cylinder would promise substantial labor savings.

68. The data obtained in the inter partes tests is representative of the efficiencies of the particular structure of the tested machines under the prevailing conditions. The data is not indicative of the efficiency of the combination claimed in the Cota patent. There is no limitation in the Cota claims with respect to the thickness of the fins or the configuration of the edges, and rounded edges would be within the language of the claims. The degree of sharpness of the leading edge presented to the material would affect efficiency. None of the wire mesh screens tested employed wire of triangular cross-section, such as shown by Herbort (Hx 5G, Fig. 7). The Vaudreuil patent is not limited to the particular wire mesh material specifically disclosed. The Hughes machine which employs a cylinder of perforate material was the most efficient machine tested.

### Noninfringement

69. Subparagraph (d) of Claim 1 of the Cota patent in suit covers only the rotating brush described in the specification of the patent and equivalents thereof.

70. The differences in means and operation between the Hughes stationary, taut wire and the Cota rotating brush are substantial. The structure of the Cota brush is complex and expensive, being of substantial diameter and length, and requiring bearing mountings and power drive means. In use, the drive means and the safety shielding required therefor block accessibility to the cylinder interior. The Hughes wire permits complete access to the cylinder interior, presents no cleaning problem, and requires no complex and expensive drive means. In operation, the Cota brush is located in slight contact with the ascending side of the cylinder, and rotates at a faster peripheral speed than the cylinder. All of the beans being elevated by the cylinder must be engaged and forced or brushed from the cylinder slots by the friction of the bristles against the beans, and thrown onto the conveyor for discharge from the cylinder. In the Hughes UBR, the beans are carried by the cylinder to an upper position where many of the beans fall into the receiving trough without contact with the wire. Those beans that are carried beyond the upper position make a single point of impingement against the taut wire spaced from the descending portion of the cylinder, and are then dropped into the trough.

71. The Hughes wire is superior to the CRCO brush with respect to sanitation, which is a major factor in the canning industry.

72. The Hughes stationary wire is not the equivalent of the rotating brush described in the Cota patent in suit.

73. The Hughes UBR follows the teachings of Vaudreuil 1,364,222. The lip slot perforations employed in the Hughes cylinder are within the description and claims of the Vaudreuil patent. The Hughes cylinder material was a well known perforate material prior to Cota's alleged invention. To the beans being separated, the Hughes screen presents a substantially smooth inner surface with a multiplicity of perforations, or rectangular slots, of a size to receive the tip extensions of unsnipped beans and carry them out of the mass of pieces by the rotation of the drum. The tip extensions or protrusions of unsnipped beans are engaged by the edges of the perforations in the same manner as in Vaudreuil.

74. Any finding of fact entered herein which may be considered in whole or in part a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law herein.

**446**

## CONCLUSIONS OF LAW

Jurisdiction over the subject matter and the parties is present.

With respect to Claims 1, 2 and 3 of the Cota patent, an actual controversy exists between the plaintiffs and defendants, which is sufficient to support a declaratory judgment as to the issue of the validity of the said claims of the patent and as to the issue of infringement of said claims. With respect to Claim 4 of the Cota patent, an actual controversy does not exist between plaintiffs and defendants.

### Invalidity of Claims 1, 2 and 3 of Cota Patent

■ With respect to relevant prior art not cited to the Patent Office, the statutory presumption of validity is either weakened or destroyed. Strzalkowski v. Beltone Electronics Corp., 371 F.2d 237, 240 (7th Cir., 1966). Since neither the Vaudreuil, Freeman, Herbort, Cadiot nor Brubaker patent, nor the Harrington and King Co. Perforated Materials General Catalog Nos. 61 (1940) or 75 (1958) was cited to the Patent Office in connection with the Cota application, the statutory presumption of validity as to them is weakened or destroyed.

■ Novelty, as required by 35 U.S.C. §§ 101, 102, does not exist if the device has been anticipated by a substantially identical prior device where the elements do substantially the same work in substantially the same way. Amphenol Corporation v. General Time Corporation, 397 F.2d 431, 437 (C.A.7th, 1968). The Cota device, as disclosed in each of Claims 1, 2 and 3, was not "new", within the meaning of 35 U.S.C. § 101.

Any differences between the subject matter sought to be patented by each of Claims 1, 2 and 3 of the Cota patent and the prior art were such that the subject matter as a whole in 1962, 1963, 1964 and 1965 would have been obvious, within the meaning of 35 U.S.C. § 103, to a person having ordinary skill in the art of separating materials from snap beans or bean sections and in the art of separating arti-cles through use of rotating cylinders and in the art of perforated materials. Graham v. John Deere Co., 383 U.S. 1, 14–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Appleton Electric Company v. Efengee Electrical Supply Company, 412 F.2d 579 (7th Cir. 1969).

### Non-Infringement of Claims 1, 2 and 3

■ Plaintiffs' device does not infringe Claims 1, 2 and 3 of the Cota patent for the reason that an invalid patent cannot be infringed. Pambello v. Hamilton Cosco, Inc., 377 F.2d 445, 447 (C.A. 7th, 1967).

■ However, if Claims 1, 2 and 3 of the Cota patent are valid, the Hughes UBR does not infringe any of them. Subsection (d) of Claim 1 of the Cota patent specifies:

"(d) means, supported independently of said cylinder in the upper half thereof, for engaging unsnipped beans hanging from, and being at least partially supported by said edges to dislodge them from said edges * * *"

35 U.S.C. § 112 provides in part:

"An element in a claim for a combination may be expressed as a means * * * for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Because there is described in the Cota specification no stationary wire for dislodging beans from "said edges", and because, within the meaning of 35 U.S.C. § 112 the Hughes stationary wire is not an "equivalent" of the structure, material, or act described in the Cota specification (namely, the rotatable brush structure), neither this element nor its equivalent is found in the Hughes device. This element is a material element in the combination. When one of the elements of a combination defined by the claim of a patent neither appears, nor is the sub-

ject of an equivalent substitution, in the accused device, infringement of the patent claim is avoided. Kennatrack Corporation v. Stanley Works, 314 F.2d 164, 167 (C.A.7th, 1963) ; Edwards v. Hychex Products, 171 F.2d 259, 260 (C.A.7th, 1948). Because Claims 2 and 3 are written in a form dependent upon Claim 1, they include all the limitations of Claim 1; because Claim 1 has not been infringed by the Hughes device, Claims 2 and 3 have not been infringed by the Hughes device.

*Effect of Cota's Failure to Disclose to Patent Office the Existence of the Hughes Machine*

■■ Plaintiffs contend that either or both of two legal consequences should follow from the fact that, after seeing the Hughes machine in January, 1965, defendants amended their claim with the intent to cover the Hughes structure but failed to inform the Patent Office that the Hughes structure had entered the market prior to the offering of the broadening amendments. One consequence contended for is that the claims of the patent are rendered invalid by reason of this conduct of the defendants. The other consequence contended for is that there can be no infringement by a device which the claims were so amended to cover. Although not wholly clear from the cases cited in support of these asserted consequences, the doctrine or doctrines appear to be equitable in nature. The benefits of such doctrine or doctrines should not be bestowed upon parties whose conduct is such as that of the plaintiffs here. After obtaining early knowledge that Cota had conceived his idea, after becoming perfectly aware that Cota was seeking a patent and had licensed CRCO, after carefully studying the CRCO machines, and before becoming aware of the Vaudreuil patent, the plaintiffs undertook to manufacture and sell a machine remarkably similar to the CRCO machine, altering it just sufficiently as this court now holds, to omit a material element of the combination claimed by Cota. The same circum-

stances compel the conclusion that this is not an "exceptional case", within the meaning of 35 U.S.C. § 285, such as to entitle plaintiffs to an award of attorney fees ·in the action.