**AMPHENOL CORPORATION, a corporation of Delaware, Plaintiff-Appellant,**

v.

**GENERAL TIME CORPORATION, a corporation of Delaware, Defendant-Appellee.**

No. 16524.

United States Court of Appeals Seventh Circuit.

June 10, 1968.

William E. Lucas, Erwin C. Heininger, Burton E. Glazov, Chicago, Ill., for plaintiff-appellant Amphenol Corp.; Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

Richard Russell Wolfe, Phillip H. Mayer, John P. Bundock, Jr., Chicago, Ill., for defendant-appellee General Time Corp.; Wolfe, Hubbard, Voit & Osann, Chicago, Ill., of counsel.

Before SCHNACKENBERG and HASTINGS, Circuit Judges, and KNOCH, Senior Circuit Judge.

KNOCH, Senior Circuit Judge.

The plaintiff-appellant, Amphenol Corporation, brought suit to recover damages and to secure injunctive relief on the ground of alleged infringement of its patent No. 3,137,122 (Resilient Means for Driving Escape Wheel) by the defendant-appellee, General Time Corporation.

The plaintiff appeals from that part of the judgment dismissing the suit, aft-

ter a bench trial, which held the patent in suit to be invalid and one of the accused devices (Form B) not to infringe. The District Court also held that the other accused device (Form A) would infringe if the patent in suit were valid. The District Court's opinion is published in 275 F.Supp. at page 903.

The plaintiff has a Borg Instruments Division and the defendant has a Westclox Division where clocks for automobiles are manufactured. It was stipulated that plaintiff and defendant compete in the sale of clocks for automobiles to automobile manufacturers.

The District Judge held that the patent in suit was invalid because the patented device was "on sale" more than one year prior to the filing of the application for the patent; the particular features which the plaintiff contended were patentable lacked utility and would have been obvious to one having ordinary skill in the clockmaking art; and such features as possessed utility were the subject of prior patents.

The patent application was filed January 4, 1962. It deals with the reduction of noise, particularly of the "tick" sound. The patent describes the invention as relating "to improvements in timepiece escape silencing."

As the District Judge found, the mainspring of the clocks involved here is wound by an electric motor which uses energy from the automobile battery. This mainspring drives a gear train (and the clock hands) at a rate determined by the rotation of an escape wheel which is alternately released and held by two pallet pins on a pallet swinging back and forth, controlled by an oscillating balance wheel. The balance wheel is intermittently impulsed in each direction by the escape wheel teeth which alternately strike the two pallet pins to swing the balance wheel back and forth at a rate controlled by a hairspring. The "tick" noise is caused by the escape wheel teeth

hitting the pallet pins. The energy released by the collision of the pallet pins with the escape wheel teeth is transmitted to the frame plates which vibrate audibly. The noise of the electric winding mechanism is not involved in this case.

The escape wheel is connected to the gear train by a pinion on the same shaft as the wheel. In a "resilient" escapement the driving force from the pinion to the escape wheel is transmitted through a spring or other resilient member.

Both parties had been making and selling automobile clocks with "solid" escapements where the pinion and the wheel are rigidly fixed to the shaft and rotate in unison. The loud tick presented a problem which was considered to be acute by the engineers at the Cadillac Division of General Motors Corporation.

■ Patent applications must be filed within one year of placing the claimed subject matter "on sale." Title 35, U.S. C. § 102(b) [1]. "On sale" does not mean an actual accomplished sale but activity by the inventor or his company in attempting to sell the patented idea. Armour Research Foundation v. C. K. Williams & Co., 7 Cir., 1960, 280 F.2d 499, 506; Magee v. Coca-Cola Co., 7 Cir., 1956, 232 F.2d 596, 600.

The facts bearing on the "on sale" issue are largely undisputed and substantially the subject of pretrial stipulation. The critical date is January 4, 1961.

The patent names Samuel Dinerstein and Harold K. Cummings as co-inventors by some mistake, conceded to be without deceptive intent, of the drafting attorney since deceased. Actually Harold Cummings independently conceived and reduced to practice the form of escapement shown in the figures one to four of

1. § 102. A person shall be entitled to a patent unless—* * * (b) the invention was * * * on sale in this country, more than one year prior to the date of the application for patent in the United States, * * *.

the patent and Samuel Dinerstein later conceived the embodiment in figure five, as shown in plaintiff's exhibit No. 1 below.

June 16, 1964 S. DINERSTEIN ETAL 3,137,122
RESILIENT MEANS FOR DRIVING ESCAPE WHEEL

Filed Jan. 4, 1962

The first escape wheel assembly made in accordance with the patent in suit was made by Mr. Cummings early in May 1960. By August, working in plain-

tiff's engineering model shop, and after full disclosure to Mr. Dinerstein, his immediate superior, the head of plaintiff's clock engineering, he completed a handmade group of six such escape wheel assemblies. He began supervision of the making of a sufficient number of such assemblies to iron out any manufacturing problems and became satisfied that the assembly could be mass produced. Engineering drawings which were not sketches but part number drawings had been prepared early in June 1960. A "deviation" release (as distinguished from a "production" release which concerns clocks made to a customer's order) was issued on June 3, 1960.

A deviation release is a routine form to authorize work on something which deviates from regular production items and concerns clocks made for any other purpose than to a customer's order. However the set of "deviation release" drawings, without intervening changes, was later incorporated into the first production release for the resilient escapement.

The plaintiff asserts that Mr. Cummings was not able to complete timekeeping and other tests; that Borg did not have a "cold box" to check operations at low temperatures. Mr. Dinerstein testified that Mr. Cummings had started timekeeping tests but that these were abandoned because the quality control man whom he asked to do the tests did not perform them. Mr. Dinerstein indicated that Mr. Cummings was making some of his own tests to satisfy certain doubts in his own mind but that Mr. Dinerstein did not know when that work was done.

Mr. Cummings, the actual inventor, was on the list of witnesses expected to be called. The defendant notes that he was in the courtroom at the time of the trial. But he did not testify and the record is silent as to what Mr. Cummings was doing after he began timekeeping tests in August 1960 and when he made additional assemblies to iron out problems.

On September 14, 1960, a handmade sample with the new escapement was sent to Cadillac and given to W. E. Barth, Cadillac's clock project engineer. Plaintiff asserts that this was an untested sample sent only to show Cadillac what efforts were being made to reduce noise and to secure the benefit of Cadillac's test program, although it was stipulated that Cadillac never gives technical suggestions as a result of its tests—only rejection or approval. Mr. Dinerstein testified that the submission's purpose would be to find out if the noise reduction was noticeable in cars and if it would pass Cadillac's acceptance test. Plaintiff notes that three other handmade clocks in Cadillac cases and unusable for other cars were delivered to Rolls Royce in Great Britain at no charge solely to obtain comparison on tick noise.

On September 20, 1960, Mr. Barth and other Cadillac engineers who installed the clock in a Cadillac automobile and listened to it in the quiet countryside were pleased with the tick noise reduction. Plaintiff contends that this could not be "approval" as held by the District Court. But R. C. Griffen, plaintiff's Detroit representative, wrote Mr. Dinerstein that the clock had been "o.k.'d" on the tick noise reduction although more work was required on the winding noise which is not an issue here. Plaintiff's engineering test record dated November 20, 1960, says the resilient escapement had been approved by Cadillac.

The District Judge found that Cadillac had taken a calculated risk in approving the feature for its clock before making all the tests. Cadillac ordered, at $10 each, ten clocks with two new features (one was the resilient escapement) which were made and delivered in October 1960 in the expectation that these would be paid for by Cadillac, which, however, did not pay and which was never pressed to do so as it was then buying production quantities of plaintiff's clocks. About half of the sum due for the ten clocks was charged off to a cost of sales account. The District Judge thought that this order and plaintiff's delivery showed clocks

with the resilient escapement were on sale in 1960. Plaintiff's position is that these ten were only test clocks and were so designated in plaintiff's contemporary internal memorandum.

There were further tests of the clock but the District Court found that these had nothing to do with Cadillac's engineering approval of the resilient escapement in September, 1960.

Customarily an automobile clock is placed "on sale" by submitting a sample with quoted price to the customer and production does not begin until a sale has been made.

On September 20, 1960, Cadillac's engineers sent the matter to the purchasing department. An Engineering Change Request was issued which, if approved by purchasing and management, would have been the basis for an order to plaintiff. Plaintiff asserts that usual procedures were not followed because of the urgency of the noise problem, and that issuance of the Engineering Change Request here only meant that both engineering and purchasing-management operations would function simultaneously in the expectation that the ECR could be canceled if tests were not satisfactory—as it was in fact later canceled in December 1960.

However the cancellation in December 1960 was attendant on Cadillac's rejection of the quoted price increase and not after a physical test. In response to Cadillac's Purchasing Department request, back in October 1960, plaintiff had quoted a price of six cents more per clock for the resilient escapement, to which Cadillac officially objected in December, while still insisting on a quieter clock. On January 5, 1961, plaintiff decided to give Cadillac the resilient escapement, though on January 6, 1961, one of plaintiff's sales executives tried to secure three cents more per clock, which Cadillac refused. Plaintiff agreed on that date to supply the resilient escapement at no extra charge and was mass producing the device within a few weeks thereafter.

Failure of some further testing occurred after production and delivery but that development does not affect the issue of whether the device was "on sale" prior to January 4, 1961.

■ The District Court found significant, as we do, the fact that when submission of samples was made to Oldsmobile in 1961 in the same manner as earlier to Cadillac, the device was admittedly "on sale." It was not error for the District Court to take note of this circumstance.

Mr. Dinerstein testified that Karl Keck, plaintiff's "top man" in the sales group, would know if and when an offer was made to Cadillac, but Mr. Keck, listed as an expected witness for plaintiff, was never called.

Plaintiff takes issue with the defendant's observance that neither Mr. Cummings nor Mr. Keck (who was no longer employed by plaintiff at the time of the trial) testified, pointing out that Mr. Cummings' deposition had been taken by defendant who could also have taken Mr. Keck's as well, that neither was required in view of the evidence adduced and the stipulated facts.

■ As the Trial Judge held, once the prima facie defense of "on sale" within the year had been established (on a showing of the sale by sample methods in the industry, the supplier-customer relationship with Cadillac, and transfer of the device in the fashion employed in customary sales) the burden of going forward with evidence fell on the plaintiff to show that this was not an "on sale" occurrence. Koehring Co. v. National Automatic Tool Co., 7 Cir., 1966, 362 F. 2d 100; George R. Churchill Co. v. American Buff Co., 7 Cir., 1966, 365 F.2d 129.

Plaintiff would distinguish these cases as holding that the invention must be reduced to practice to the satisfaction of the inventor before on sale activity can be found, and that the inventor was not fully satisfied here with the timekeeping quality, etc. of the device.

■ As Judge Swygert said in Koehring, an inventor may not be permitted to use a period of experimentation as a competitive tool, and the exception made for a reasonable period of experimentation must be so limited as not to interfere with effectuation of the policy underlying the general rule.

■ District Judge Will found ample support for the conclusion that any wish for experimentation which may have existed was secondary to the competitive desire to satisfy a customer who might otherwise turn to plaintiff's competitors. Further it appears that full scale production of the resilient escapement began without any prior use of test data from Cadillac. This was not a submission of samples solely for experimental use; nor was there a complete absence of any sales effort as in Tractor Supply Co. v. International Harvester Co., N.D., Ill., E.D., 1967, 155 USPQ 420, 430, cited by plaintiff.

The Trial Judge found that resilient escapements were anticipated in the prior art. The British patents Mauthe 403, 267 (Sound-damping Movement for Clocks) and Junghans 2,665 (Escapement for Clocks), and United States patents Jeanneret 2,464,316 (Watch Movement) and Arnold 675,582 (Clock Train), none of which was before the Patent Office examiner, thus weakening the presumption of validity of an issued patent [2] all disclose resilient escapements with freely journalled escape wheels and resilient drives. The noise reducing function of the patented device before us is attained by a spring driven, freely journalled escape wheel. We agree with the District Judge that the shape or particular mounting of the spring has not been shown to have any effect on the sound reducing qualities of the escapement. The devices disclosed in the four patents above listed would have the same capacity for noise reduction as the plaintiff's device.

The quieting effect of the plaintiff's device is the result of the absorption and the dissipation of the collision energy through the spring and the loose escape wheel mounting. All of the prior art resilient escapements would have a quieting effect. They are, as the District Judge found, equivalent in means, function and result although they have used various types of springs. We would agree that plaintiff's device lacks novelty. Monroe Auto Equipment Co. v. Heckthorn Mfg. & Supply Co., 6 Cir., 1964, 332 F.2d 406, 415; Delta Mfg. Co. v. E. L. Essley Machinery Co., 7 Cir., 1946, 153 F.2d 905, 906; Noble Co. v. C. S. Johnson Co., 7 Cir., 1957, 241 F.2d 469, 479.

Plaintiff contends that the defendant stipulated that the patent in suit was novel and not anticipated. The defendant replies that the defendant conceded only that no one prior patent disclosed the *whole* of the patented subject, that the real issue was whether that subject presented the requisite quality of patentable invention, or "unobviousness"; that defendant did not contend that the prior art taught the use of resilient escapements specifically for reducing the tick noise in a clock. The District Court also noted that the specific purpose of the prior art patents was better timekeeping through smoother transmission of power; the evidence showed an identity of functional elements with the same capacity for sound reduction as plaintiff's device.

■■ There may have been some confusion here between the parties with respect to the difference between novelty and invention. As the Court said in Monroe Auto, supra, a device to be patentable must possess novelty and invention. Novelty does not exist if the device has been anticipated by a substantially identical prior device where the elements do substantially the same work in substantially the same way. The

2. L. S. Donaldson Co. v. LaMaur, 8 Cir., 1962, 299 F.2d 412, 420, cert. den. 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 57; American Infra-Red Radiant Co. v. Lambert Industries, Inc., 8 Cir., 1966, 360 F. 2d 977, 989, cert. den. 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144.

Sixth Circuit in Monroe Auto carefully pointed out (332 F.2d at page 415) that although a prior device may not be sufficiently substantial in identity with the patented device to anticipate (and thus bar novelty) its disclosures may nevertheless negative invention because in the light of the prior device the patented device would have become obvious.

■ As a rule, in order to have anticipation, all of the elements of the patented device or their equivalents must be found in a single prior device. Firestone v. Aluminum Co. of America, 6 Cir., 1960, 285 F.2d 928, 930; Allied Wheel Products v. Rude, 6 Cir., 1953, 206 F.2d 752, 760. But it is sufficient if the general aspects are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art. I Walker on Patents (Deller, 2d ed.) § 77 at page 363, citing Model Bottling Machinery Co. v. Anheuser-Busch Brewing Assn., 8 Cir., 1911, 190 F. 573, 579, cert. den. 223 U.S. 732, 32 S.Ct. 528, 56 L.Ed. 634.

The plaintiff apparently construed defendant's concession that no one prior patent disclosed the whole of the patented subject as an admission of non-anticipation and hence of novelty.

If the District Judge has decided an issue here which was not really submitted to him, we conclude that in the posture of this case, at worst mere harmless error has occurred.

■ With reference to the aspect of utility, plaintiff's claimed useful improvement over prior art is the substantial reduction of tick noise. The Trial Judge found, as we do, from our study of the record, that the elements of the plaintiff's device which plaintiff asserts are not to be found in the prior art do not contribute to reduction of noise, better timekeeping or longer life as asserted during the trial. Such test data as was submitted did not prove that quieter operation was secured by, for example, telescoping of the helical connecting spring over the hubs of the wheel and pinion, or the space between the hubs. The "difference" between the teaching of the prior art does not qualify as invention if that difference lacks utility. It must be the feature which accomplishes the purpose set out in the specification. Imperial Stone Cutters, Inc. v. Schwartz, 8 Cir., 1966, 370 F.2d 425, 429.

When considering obviousness, the District Judge observed that the major difference between plaintiff's device and the prior art resilient escapements is frictional gripping of the escape wheel by the driving spring which was not shown to contribute to noise reduction and which was known in the clockmaking art. Differential German patent 363902 (Time Lapse Mechanism). We cannot agree with the plaintiff that the Trial Court erred in over-simplifying the claims when comparing the alleged invention with the prior art to determine novelty, utility and obviousness.

Plaintiff asserts that obviousness could not have been present here because defendant's engineers failed to achieve this improvement. However, Robert F. Cofoid, of the defendant's engineering department, testified that his company considered a resilient escapement with a hairspring type of resilient spring in the manner of Mauthe in 1955 but did not feel that the sound reduction was worth the additional cost; that again in 1961, defendant evaluated a resilient escapement and considered it not worth the cost. Defendant did not make the device until advised that Oldsmobile was going to require it. Max E. Schlenker, employed as an engineer in increasingly responsible positions by defendant, testified to the same effect. There was no evidence that none of the defendant's earlier experiments with resilient escapements "worked". It appeared that the resilient escapement was not pursued until customers ordered it. Mr. Cofoid testified that "without exception we felt it wasn't worth the additional cost unless motor companies wanted to pay for it."

■ Commercial success and market acceptance, while factors to consider, do

not in themselves make invention. Graham v. John Deere Co., 1966, 383 U.S. 1, 35–36, 86 S.Ct. 684, 15 L.Ed.2d 545.

 Although there is no cross appeal, the defendant seeks to have this Court reverse a part of the judgment below on the ground that the District Court erred in holding that were the patent valid, defendant's accused device Form A would infringe. Defendant argues that Form A does not embody what the patent says is the invention. Even were we moved to agree, defendant is in no position to urge partial reversal at this stage. United States v. American Ry. Express Co., 1924, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087; Penfield Co. of Cal. v. S. E. C., 1947, 330 U.S. 585, 594, 67 S.Ct. 918, 91 L.Ed. 1117. But we do not agree. Mr. Cofoid testified that his firm saw the plaintiff's escapement in January 1961, that when Oldsmobile advised that defendant would have to use an escapement of plaintiff's type, samples were made up on a comparable design. That was Form A. Despite defendant's arguments that such aspects as an impositive, slipping drive and non-energy-storing escapement springs, emphasized by the patent, are missing in Form A, the latter is virtually a copy of the plaintiff's device in form and function. Form B was apparently designed and made for the express purpose of avoiding infringement. The plaintiff points out that Ford Motor Company's specifications require changes to be submitted in advance. Yet units containing Form B were shipped as part of a continuing order to Ford without advice concerning the substitution, apparently on the theory that this was only a minor change, as minor changes were not customarily brought to the attention of Ford. Nevertheless our study of the exhibits shows that Form B does not have the same mounting of the spring driver as the patent in suit and does resemble the prior art as the District Court found. It performs the same function but in a manner different from the device of the patent in suit.

We have considered all other arguments advanced by the parties and have consulted the cases and authorities to which our attention has been drawn. We are satisfied that the judgment of the District Court must be affirmed.

Affirmed.