446 F.2d 610
 78 L.R.R.M. (BNA) 2061, 66 Lab.Cas. P 11,976
 LOCAL UNION NO. 186, UNITED PACKINGHOUSE FOOD AND ALLIED
WORKERS, AFL-CIO, an Unincorporated Labor
Corporation, Plaintiff-Appellant,
v.
ARMOUR AND COMPANY, a Foreign Corporation, Defendant-Appellee.
 No. 71-1098.
United States, court of Appeals, Sixth Circuit.
Aug. 17, 1971.
 
 S. Del Fuston, Chattanooga, Tenn., for appellant.
 R. Allan Edgar, Chattanooga, Tenn., Miller, Martin, Hitching, Tipton, Lenihan & Waterhouse, Chattanooga, Tenn., on the brief, for appellee.
 Before EDWARDS, CELEBREZZE and PECK, Circuit Judges.
 PECK, Circuit Judge.
 
 
 1
 This appeal from a summary judgment raises questions of interpretation of a collective bargaining agreement between Local Union No. 186, United Packing-house, Food and Allied Workers AFL-CIO, the appellant, and Armour and Company, appellee, concerning the company's liability for vacation pay to its employees when it closed its plant in September, 1966. The union contends that all employees had 'earned' vacation pay, to be disbursed in 1967, by the time the plant closed; the company contends, and the District Court agreed, that the employees would be eligible to receive vacation pay only if they were working on January 1, 1967, which they obviously were not, since the plant had closed.
 
 
 2
 The dispute centers on the following provisions in the agreement:
 
 
 3
 '49. Continuous Service and Anniversary Date. The Continuous Service Date of an employee shall be:
 
 
 4
 '(a) In the case of employes hired hereafter, the employes presently on the payroll who have not as yet established seniority, the date on which the employe first establishes departmental seniority on the plant payroll.
 
 
 5
 '(b) In the case of employes presently on the payroll who have established seniority, the plant service date heretofore in effect and use for determining vacation eligibility for each such employe.
 
 
 6
 'The Anniversary Date of an employe shall mean each anniversary of the employe's last established Continuous Service Date.
 
 
 7
 '50. Qualification for Vacation:
 
 
 8
 '(a) Vacations for all employes will be granted on a calendar year basis in accordance with the following eligibility requirements.
 
 
 9
 '(1) Employes who have one (1) or more years of continuous service as of January 1 (except for new employes provided for below) will be granted vacations during the calendar year January 1 to December 31, provided they have worked a minimum of one hundred fifty (150) days during the preceding calendar year.' '92. (After providing for separation pay) * * * 'To the separation allowance computed as per above, add pay for the vacation, if any, for which the employe has qualified but not taken.'
 
 
 10
 When the plant closed, separation pay, as provided in 92, was paid, but the company refused to compensate the workers for what the union contended was already earned vacation pay. The company took the position that the employees had not yet 'qualified' for the pay under 92, and therefore were not due such wages. When arbitration of the dispute proved futile, the union filed a complaint in the District Court. After considering several affidavits filed by each side, the court determined that summary judgment was proper, and filed an opinion finding for the company. Thereafter, the union filed a supplemental affidavit, but the District Court declined to modify its ruling. The union then perfected this appeal.
 
 
 11
 The District Court relied heavily on the fact that section 59(a) of the agreement provided that employees mandatorily retired during the year would receive prorata vacation pay for each quarter worked, assuming they had worked 38 hours in that quarter. The Court noted correctly that under the union's interpretation this provision would be unnecessary to protect the retiree who had worked 150 days since he would then be entitled to full vacation pay. Indeed, as the Court and the company both observe, a retiree who had worked 150 days might be in worse position than one who had not, since the former may have worked in only two quarters, thus receiving only 1/2 his vacation pay, while the latter would receive his full pay. From this the Court concluded that, for the nonretiring worker, only working 150 days was insufficient to qualify for vacation pay. We conclude that the District Court misconstrued the purpose of 59(a), which manifestly was to protect the retiree who had not worked 150 days to qualify for full vacation pay. Thus, while there is unquestionably some inconsistency between the literal wording of 59(a) and the union's position, the common sense of inserting some provision in the contract to protect the mandatory retiree outweighs the literal construction for which the company contends.
 
 
 12
 Many tribunals have taken the view that vacation pay is simply an alternate form of wages, earned at the time of other wages, but whose receipt is delayed. So eminent a jurist as Judge Learned Hand declared, in 1940, that:
 
 
 13
 'A vacation with pay is in effect additional wages. It involves a reasonable arrangement to secure the wellbeing of the employees and the continuance of harmonious relations between employer and employee. The consideration for the contract to pay for a week's vacation had been furnished, that is to say, one year's service had been rendered prior to June 1, so that the week's vacation with pay was completely earned and only the time of receiving it was postponed.' In re Wil-Low Cafeterias, Inc., 111 F.2d 429, 432 (2d Cir. 1940).
 
 
 14
 Although in different contexts, this Court has recognized that concept. Smith v. Kingsport Press, Inc., 366 F.2d 416 (6th Cir. 1966); Hire v. E.I. DuPont DeNemours and Co., 324 F.2d 546 (6th Cir. 1963).
 
 
 15
 This view of vacation pay indicates that the company gains no substantive benefit per se from requiring employees to be 'on the payroll' on January 1, but rather has gained the benefits from the work done in the previous year. Thus, there is no difference in terms of eligibility, between the worker who has worked only 150 days, and one who has worked 360. The company has derived in effect the same benefit from the work of both-- and has agreed to pay additional wages to both. From this approach, then, we must ask whether, under contract doctrine, the January 1 date is a material part of the contract, rendering the failure to meet that condition fatal to the worker, or whether, on the other hand, it is something less than critical to the purpose of the parties.
 
 
 16
 The resolution of this issue requires consideration of the past negotiations and contracts of the parties. Such an inquiry reveals that, prior to the 1960 contract, there were two key dates for each employee: his 'continuous service date,' basically the day on which he originally began work, and his 'anniversary date,' which indicated an anniversary of the continuous service date. In the 1956 contract, an employee was eligible for vacation pay 'after the Anniversary Date.' While first year employees were required to work 185 days to qualify for vacation, other employees received vacation unless they had been absent for 60 continuous days.[1] It thus appears that, in 1956, the critical point was the anniversary date. There were, however, two major exceptions: (1) Employees who had been employed between 2-5 years could, upon request, be allowed to take their vacations up to 3 months in advance of their anniversary date. This, however, was only allowed because 'it is presumed (he) will continue in the employment of the plant up to his anniversary date.' Thus, at least in this context, the requirement of working until the anniversary date was important. (2) Employees who had worked more than 5 years were allowed to request vacation up to 5 months in advance. Here, however, there was no express contractual assumption that these employees would work until the anniversary date.
 
 
 17
 The critical change came in 1960. In that year a new clause, 'Qualification for Vacation,' was added to the contract. Vacations were made available only on a calendar year basis, and January 1 was the date on which eligibility turned. Thus, where the 1956 contract had provided that a new employee had to work 185 days before his anniversary date, he now had to work 150 days before January 1. The 1960 contract also dropped the provisions allowing long-time employees to take vacations early.
 
 
 18
 From this, the company urges that January 1 was made the anniversary date, and, moreover, that it was imperative that the employee be working on January 1 in order to take vacation. There is much substance in the argument which the company presses on us, but we find that the fact that the contract in several places differentiates the 'anniversary date' from January 1 indicates sufficiently that, however plausible the argument might now seem, that was not the primary purpose the parties shared at the time the change was made. Instead, we conclude that the change was made mostly for administrative reasons, to allow the company to have all vacations earned in a prior calendar year taken in the calendar year next succeeding. We find, therefore, that the change in the date of eligibility from the anniversary date to January 1 was not a change of a material nature, but one of administrative convenience, and that the January 1 date was not a sine qua non for eligibility for vacation.
 
 
 19
 When situations such as this have arisen in the past, they have almost uniformly been resolved in the union's favor. In Mays Landing Water Power Co., 12 L.A. 861 (1949), the employer shut down before a date which, in contrast to the ambiguous January 1 date here, was clearly an eligibility date. Nevertheless, the arbitrator granted vacation pay, stating that 'The (eligibility date) is simply a device for finally implementing the results of accumulated employment experience. To ignore the accumulation of such past employment experience because of the impossibility of meeting the eligibility day is to give undue determinative significance to only one of the generally qualifying tests.' Id. at 863. Similarly, in L. Hyman Co., Inc., 13 L.A. 803 (1949), where the contract was again clear that employees had to be 'on the payroll' on a specified date, the arbitrator adhered to the concept that vacation pay is an earned right, based primarily upon service, and that the employees were entitled to full vacation pay when the plant closed prior to the eligibility date. Accord: Star Woolen Mill Co., 14 L.A. 185 (1950). While these cases are of course not controlling, they are indicative of the approach taken in labor arbitration. In addition, they represent well-established precedents of which the parties should have been aware. Had they desired to alter the case law, they should have done so by explicit language. Professor Archibald Cox, in a decision cited to us by both sides, wherein he acted as arbitrator, commented that clauses specifying that only employees employed on a specific date are eligible for vacation are common primarily because of these past decisions. Telescope Folding Furniture Co., 49 L.A. 837 (1967). In that case, which closely parallels this, the contract provided that the following employees were eligible to receive vacation pay:
 
 
 20
 'All employees who have been on the payroll of the company for one (1) year or longer prior to August 1 of the vacation year. Employees to be eligible for one (1) weeks vacation shall have worked (140) working days prior to August 1 of the vacation year.
 
 
 21
 The contract provision is obviously not the same as that here. But the issue was precisely the same. And Professor Cox responded as follows:
 
 
 22
 'The agreements mention August 1 only as a cut-off date for determining length of service. There is no clause stipulating that vacations should be limited to workers on the payroll or otherwise in the Company's employ, on August 1, or any other particular date. * * * Under contracts containing no express requirements that the employees be on the payroll or in the Company's employ on any particular date in order to qualify for vacation, both the state and federal courts, and also many arbitrators, have held that an employee is entitled to his vacation pay even though his employment was permanently severed prior to the vacation period.' Id. at 838.
 
 
 23
 That case was much stronger for the company, since it involved employees who resigned. The present case, which concerns only involuntarily unemployed workers, must fall within the ambit of Professor Cox's declaration.
 
 
 24
 This, however, does not necessarily resolve the issue. Even if this view is accepted, it could be argued that it goes no further than saying that while January 1 was the day from which vacations could be taken (without special dispensation), the critical date remained, as it appeared to be in the 1956 contract, the anniversary date. Although that is nowhere required in the contract, it is a permissible, if somewhat strained, interpretation, in light of the past bargaining history. Thus, our conclusion that January 1 is not the anniversary date may only benefit those workers who had already reached their own, individual, anniversary dates by the time of closing. For those workers who had not reached their anniversary date by the date of the closing, we face the question of whether it was necessary that they reach that date or whether, as the union has contended, the mere fact of working 150 days qualified them for vacation.
 
 
 25
 In determining this issue, we turn to the general rules of contract law, a path which has been urged by many. See, e.g., Summers, Collective Bargaining Agreements and the Law of Contracts, 78 Yale L.J. 525 (1969). Even assuming the company's argument that the anniversary date was an inexorable condition of eligibility for vacation, we find critical the fact that it was the action of the company itself which made impossible the satisfaction of this condition. This situation is covered fully by Professor Corbin:
 
 
 26
 'The occurrence of the event is eliminated as a condition if it is prevented by the fault of the promisor-- either as a breach of an actually implied promise, by intentional action to avoid having to pay, or by wrongful negligence. This is true even if the contract is aleatory; the promisor must not wrongfully increase the risk carried by the promisee.' 6 A. Corbin, Contracts 1362, p. 509 (2d ed. 1962).
 
 
 27
 Similarly, the First Restatement on Contracts, 415 (1932), declares:
 
 
 28
 'A duty under a unilateral or independent contractual obligation * * * is discharged by a manifestation by the obligee to the obligor, at or before the time when performance is due, of unwillingness to receive the performance when due. * * *'This doctrine has not been lost on labor arbitrators themselves. In one of the earlier cases on this point, Mays Landing Water Power Co., 12 L.A. 861 (1949), the arbitrator, in awarding vacation pay for workers left unemployed by reason of a plant shutdown, observed:
 
 
 29
 'By shutting down plant operations the Company has made it impossible for union members to perform under the agreement. * * * This represents abrogation of contract by preventing or hindering performance by the other party. When one party to a contract prevents or hinders performance requisite under the contract for the creation or continuance of a right in favor of the other party, the party initiating the preventing or hindering act is properly liable. * * *' Id. at 863.
 
 
 30
 Thus it appears that the company's unilateral action in closing down the plant, which is effectively a refusal to accept the proffer of continued performance on the part of the employees, removes the obligation of working until their anniversary dates, even if it is viewed as a material part of the contract.
 
 
 31
 Accordingly, an order will be entered reversing the judgment of the district court, and entering judgment for the appellant union.
 
 
 
 [1]
 There were other methods by which the employee could still become eligible for vacation, but they are irrelevant here