Theodore R. BERGSTROM and Thermograte Enterprises, Inc., Plaintiffs,

v.

SEARS, ROEBUCK AND CO. and Cardinal Foundry & Supply Company, a division of Production Experts, Inc., Defendants.

Civ. No. 3-75-248.

United States District Court,
D. Minnesota,
Third Division.

Aug. 17, 1978.

John D. Gould, Merchant, Gould, Smith, Edell, Welter & Schmidt, P. A., Douglas J. Williams, Minneapolis, Minn., for plaintiffs.

Charles E. Steffey, Robert O. Vidas, Schroeder, Siegfried, Ryan, Vidas & Steffey, Minneapolis, Minn., for defendants.

FINDINGS OF FACT

CONCLUSIONS OF LAW

ORDER FOR JUDGMENT

MacLAUGHLIN, District Judge.

The sole issue before the Court is whether or not United States Design Patent No. 228,728 is invalid pursuant to 35 U.S.C. § 102(b) because the ornamental design subject matter of the patent was on sale, in public use, or described in a printed publication more than one year prior to the filing date of the patent.

This Court, having heard and considered all of the evidence presented at trial, as well as the pleadings and the extensive pre-trial and post-trial memoranda of counsel, makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT

1. Theodore R. Bergstrom, plaintiff, is an individual and a resident of the State of Minnesota. During the pertinent time frame of this litigation, including the period from 1970 to the date of trial, Mr. Bergstrom resided at 51 Iona Lane, St. Paul, Minnesota.

2. Thermograte Enterprises, Inc., plaintiff, is a Minnesota corporation having its place of business at 300 Atwater, St. Paul, Minnesota, and Theodore R. Bergstrom is its president.

3. Cardinal Foundry & Supply Company, defendant, is an unincorporated division of Production Experts, Inc., having its place of business at Cleveland, Ohio; and it is the manufacturer of the alleged infringing products.

4. Sears, Roebuck & Co., defendant, is a New York corporation; and it is a retailer of the alleged infringing products.

5. Theodore R. Bergstrom is the named patentee and owner of United States Design Patent No. 228,728, which is for a design of a tubular fireplace grate. U. S. Design Patent No. 228,728 issued on October 23, 1973, for a term of 14 years. The application for this patent was filed December 14, 1971.

6. Defendants contend that U. S. Design Patent No. 228,728 is invalid pursuant to 35 U.S.C. § 102(b) because the ornamental design subject matter of the patent was (1) on sale, and/or (2) in public use, and/or (3) described in a printed publication more than one year before the December 14, 1971, filing date of the patent. Thus, the "critical date" for the Bergstrom Design Patent is December 14, 1970.

7. Plaintiff Theodore R. Bergstrom had considered the problem of the inefficiency of fireplaces for a number of years. In late 1969 or early 1970 he bent an electrical conduit generally into the configuration of the letter "C" and wired this tube to a standard fireplace grate in his basement fireplace. Mr. Bergstrom observed and tested this structure and determined that cool air was drawn into the bottom of the tube and was heated by the fire and expelled from the top of the tube at elevated temperatures into the room.

8. In January of 1970, Mr. Bergstrom prepared a sketch of a "single-bend" tube design, and he ordered ten tubes from Metal-Matic, Inc. of this design. In February of 1970, Mr. Bergstrom purchased steel

strap for assembly of the tubes of the single-bend tube design into grates. Mr. Bergstrom assembled a prototype unit on or about March 1, 1970.

9. The prototype assembled on or about March 1, 1970, by Theodore R. Bergstrom utilized a separate steel strap attached to the lower part of the grate as a log retaining strap and it had legs of unequal length bolted to the tubes. Mr. Bergstrom tested the prototype and determined that it operated very well.

10. At this time, March of 1970, Mr. Bergstrom was a metallurgical engineer employed by the 3M Company in St. Paul, Minnesota. He was the inventor of several 3M patents, and he was familiar with the process used by 3M inventors to record, witness, and document inventions.

11. Mr. Bergstrom, on or about March 15, 1970, invited Mr. and Mrs. Jack Allison, who are close personal friends, and Mr. Robert Sternal, a neighbor and close friend, to his home, and they witnessed what Mr. Bergstrom considered to be his invention as of that date. The design of the device witnessed by Mr. Bergstrom's friends was the single-bend prototype using the tube design.

12. Mr. Bergstrom prepared two documents recording the circumstances surrounding the development of the single-bend prototype and the witnessing of the device by his close personal friends. The first document was mailed by Mr. Bergstrom to himself by certified mail on March 25, 1970. The second document was signed by Mr. Bergstrom and Mr. Robert Sternal, Mr. Bergstrom's next-door neighbor and friend, on March 25, 1970, and was notarized at that time.

13. As of March, 1970, Mr. Bergstrom had the one operational prototype of his single-bend invention, but he was not satisfied with the design and appearance of it.

14. In the latter part of March, 1970, Mr. Bergstrom sketched two additional design configurations for tubes and he ordered six tubes of each design from Metal-Matic, Inc. One design was characterized by three bends in the tubes. (Plaintiff's Exhibit 9). The other design was characterized by two bends in the tubes, plus a third slight bend resulting in a slight incline of the tubes at the lower end of the "C" configuration. (Plaintiff's Exhibit 10).

15. Mr. Bergstrom assembled the two sets of tube designs in April of 1970. He tested both structures in the fireplace located in the basement of his home at 51 Iona Lane, St. Paul, Minnesota. Mr. Bergstrom chose as his preferred design the double-bend configuration with the third slight bend resulting in a slight incline of the tubes at the lower end of the "C" configuration. (Plaintiff's Exhibit 10). The Court finds that the tubular fireplace grate described in U. S. Design Patent No. 228,728 was reduced to practice in April, 1970.

16. The March, 1970, single-bend prototype and the April, 1970, prototypes were assembled with conduit clamps. Mr. Bergstrom concluded that conduit clamps were unsatisfactory for assembly and he decided to use a "U-bolt" construction method. On June 18, 1970, Mr. Bergstrom purchased enough U-bolts from the Goodin Company to assemble one unit. Mr. Bergstrom assembled one unit with the U-bolts sometime after June 26, 1970, during the summer of 1970.

17. With respect to the marketing of his invention, Mr. Bergstrom intended to go into the mail order business. He was reasonably knowledgeable in the mail order business, and he thought it was a good way to start his business. In connection with his interest in the mail order business, Mr. Bergstrom decided to prepare a fact sheet with which to reply to inquiries from prospective customers. He first prepared a pencil draft of a fact sheet. Then he took photographs of the U-bolt constructed prototype some time after June of 1970 and before September 12, 1970, to include in the fact sheet. Mr. Bergstrom prepared a final typed draft of the fact sheet. He then took it to Walter Nippolt, who made 500 copies for Mr. Bergstrom on or about September 12, 1970, at a cost not exceeding $17.50.

18. Mr. Bergstrom never used the fact sheet to reply to customer inquiries, nor did he ever use it as a device for soliciting orders from potential customers. This was primarily due to the fact that by the time Mr. Bergstrom began to offer his invention for sale, in February, 1971, the construction of the fireplace grate had been changed from a U-bolted structure to a welded structure and the fact sheet no longer accurately represented the construction of the product. Mr. Bergstrom also concluded that the fact sheet was not adequate for its intended purpose because the original was typed, the photographs looked amateurish, and the sheet was in black-and-white.

19. In January and February of 1971, which is after the critical date, Mr. Bergstrom had a two-color, three-fold, printed brochure professionally prepared by an advertising agency which he did use for the purpose of replying to mail order inquiries.

20. Parade Magazine is a magazine which appears in various newspapers around the United States, including the St. Paul Sunday newspaper. Parade of Progress is a column in that magazine which describes new ideas and new inventions of consumer products. The editor of the column is Lawrence Galton who writes the column under the pen name of Peter Dryden.

21. a. Inventors, manufacturers, and people with new ideas or products write to Mr. Dryden to attempt to interest him in their products. They hope that he will write a description of their products in the Parade of Progress column. No charge is made for this publicity.

b. A typical write-up in the Parade of Progress column includes a photograph of the product and a paragraph describing the product including the name and address of the manufacturer and price information.

c. Mr. Bergstrom learned about the Parade of Progress column through the St. Paul Sunday newspaper.

22. a. In late September or early October of 1970, Mr. Bergstrom prepared a draft of a letter to Peter Dryden with the intent of persuading Mr. Dryden to do a write-up of the fireplace grate in his Parade of Progress column.

b. Mr. Bergstrom gave the draft of this letter to his wife to type and send and he intended that the letter be sent to Mr. Dryden. While there has not been conclusive proof of receipt of this letter and of a subsequent letter of November, 1970, to Mr. Dryden, the Court finds that there is sufficient evidence from which to infer receipt. Therefore, the Findings and Conclusions are based on those inferences with respect to both of these letters to Mr. Dryden.

c. In the September or October, 1970, letter to Mr. Dryden, Mr. Bergstrom stated, [e]nclosed is a description of a product I would like you to consider for inclusion in the "Parade of Progress". Your criteria for selection seems to be something new and unique for home and family. To the best of my knowledge the article we are making is new and unusual.

d. Defendants argue that one sentence of the letter, despite all other language to the contrary, converted the letter into an offer of the fireplace grate for sale to Mr. Dryden: "The item can be obtained from Thermograte Enterprises, 51 Iona Lane, St. Paul, Minn. 55117 for $49.95 + shipping charges."

e. After reviewing all of the evidence, and in the light of the testimony and demeanor of Mr. Bergstrom, this Court finds that Mr. Bergstrom did not regard Mr. Dryden as a prospective purchaser of the fireplace grate and did not write to Mr. Dryden as if he were a prospective purchaser. To the contrary, Mr. Bergstrom wrote to Mr. Dryden as the editor of the Parade of Progress column. The purpose of the communication was not to elicit a sale from Mr. Dryden, but to persuade Mr. Dryden that the tubular fireplace grate was a new and unique product worthy of inclusion in the column. For this reason, Mr. Bergstrom enclosed in the letter to Mr. Dryden a recent article from Popular Science Magazine reviewing other fireplace accessories to improve the effectiveness of fireplaces, which did not describe Mr. Bergstrom's

grate, and a copy of the September fact sheet, to convince Mr. Dryden that the grate was unique and different. Mr. Bergstrom included information about the price of the grate in order that Mr. Dryden could incorporate such information in his column, as was customary, in the event that he decided to do a write-up on the grate.

23. a. Mr. Dryden does not and has never considered the submissions to him of the products identified in the submissions as offers of sale either to himself or to Parade Magazine. He does not regard the writers of the submissions as having the intent to sell himself or the magazine anything. Rather, in Mr. Dryden's view, the submission authors are writing with the intent to persuade him to publish information about the devices described in the submissions.

b. Mr. Dryden has never purchased one of the devices described in the submissions which he receives in connection with his column.

c. When Mr. Bergstrom wrote Mr. Dryden in September or early October, 1970, he was not then ready to sell the tubular fireplace unit. He had only the one previously described U-bolt constructed prototype; otherwise he had no other units on hand to sell to anyone.

24. Mr. Bergstrom observed a problem with the U-bolt construction method. When the grate was heated during operation, the structure clanged and banged. In October, 1970, Mr. Bergstrom considered welding the units to avoid the problem of clanging and banging. On or about October 10, 1970, Mr. Bergstrom himself welded the U-bolt prototype. Mr. Bergstrom was not an expert welder, and he burned a hole in one of the tubes. Sometime after he welded the unit, Mr. Bergstrom again tested the device to see if it was noisy.

25. On October 7, 1970, Mr. Bergstrom confirmed an order with Metal-Matic for additional tubes to fabricate ten units. He selected the double-bend configuration with the third slight bend resulting in a slight incline of the tubes at the lower end of the "C" configuration (Plaintiff's Exhibit 10) as the design of these units. On or about November 11, 1970, the tubes to fabricate ten units were ready to be picked up from Metal-Matic. Sometime during late October of 1970 or early November of 1970, Mr. Bergstrom decided that he would have a metal fabricating company weld and assemble the units for him instead of doing it himself.

26. a. On or about November 27, 1970, Mr. Bergstrom prepared a draft of a second letter to Peter Dryden of Parade of Progress. The reason Mr. Bergstrom was writing Mr. Dryden by this second letter was that, in the interim period which had lapsed since the writing of the first letter, Mr. Bergstrom had made the decision that the U-bolt structure was inadequate and he had decided to adopt the welded structure as his completed design. Further, he had decided that rather than ship and try to collect shipping charges, he would ship post-paid. These changes required additional costs; and Mr. Bergstrom felt he had better correspond again with Mr. Dryden to update his file. Although not entirely clear, it appears that a copy of the fact sheet was included with the letter.

b. This letter, like its predecessor, was written with the intent to induce Mr. Dryden to include a write-up about Mr. Bergstrom's fireplace grate in his column, and not for the purpose of selling the grate to Mr. Dryden.

c. Mr. Bergstrom received no reply to either his first or second letter to Mr. Dryden. Mr. Dryden had no recollection of receiving either of the letters or the fact sheet, but the Court finds there is sufficient evidence to infer receipt.

27. a. Mr. Dryden receives approximately 200 submissions per week for his Parade of Progress column. No one assists him in opening his mail. All submissions which are rejected for a particular week's column are discarded, with the exception of a few which are retained if they might be used in a later column. It is rare to retain a submission on file for two to three months and even more unusual to retain it for as long as a year.

b. Product submissions sent to Mr. Dryden are not available to the public, except insofar as they may be published in the Parade of Progress column. The submissions which are not immediately discarded or used are kept in files which are not indexed in Mr. Dryden's home.

28. Mr. Dryden is the only person to whom copies of the September fact sheet were ever distributed and he does not recall ever having received the fact sheet, although it was apparently received by him.

29. Mr. Bergstrom had written Sunset Magazine sometime in mid-October, 1970, and requested general information about the magazine's readers, circulation and rates. Mr. Frank Kelley, a publisher's representative for Sunset Magazine, responded to Mr. Bergstrom's inquiry on October 26, 1970.

30. a. Mr. Bergstrom, while in Chicago, met with Mr. Kelley in the early part of December, 1970, and inquired about placing an advertisement in Sunset Magazine. During the meeting, Mr. Bergstrom did not give Mr. Kelley a unit, nor did he offer to give or to sell Mr. Kelley a unit. Further, Mr. Kelley did not ask to buy a unit.

b. Mr. Bergstrom's purpose in meeting with Mr. Kelley was to discuss the placement of a future advertisement in Sunset Magazine, and not to make an offer of sale to Mr. Kelley.

c. Mr. Kelley's interest in meeting with Mr. Bergstrom was in his capacity as the publisher representative for Sunset Magazine and not as a prospective purchaser of a tubular fireplace grate. Mr. Kelley stated that he "was interested in answering his [Mr. Bergstrom's] questions and selling the ad."

d. Mr. Kelley did not retain the two photographs of the fireplace grate which Mr. Bergstrom showed him. Furthermore, Mr. Kelley neither received nor was shown a copy of the September fact sheet. All communications received from Mr. Bergstrom by Mr. Kelley and Sunset Magazine were stored in files at the headquarters of Sunset Magazine and ultimately put on microfilm. These files were not accessible to the public.

e. At the time of the meeting with Mr. Kelley, Mr. Bergstrom still only had the one damaged welded unit on hand. Mr. Bergstrom did not have any of the 10 units he had ordered until December 9, 1970, when he picked up the units from the fabricator, Standard Iron and Wire Works.

31. a. After obtaining the units on December 9, 1970, Mr. Bergstrom photographed a unit both in and out of his fireplace in order to prepare his ad copy. On December 12, 1970, Mr. Bergstrom wrote to Mr. Kelley ordering an ad for publication in the February issue of Sunset Magazine. Mr. Bergstrom enclosed an ad layout with two glossy photographs.

b. The order and ad copy were received by Mr. Kelley after December 12, 1970, and it was processed on December 21, 1970.

c. In connection with placing the ad, various proofs were sent to Mr. Bergstrom for review and approval. He made a correction in the first proof by a telegram dated January 6, 1971. A subsequent proof was accurate and Mr. Bergstrom gave it his approval.

d. Mr. Bergstrom's first advertisement of the fireplace grate of his invention appeared on page 182 of the February, 1971, issue of Sunset Magazine, which was first published in early February of 1971.

e. Mr. Bergstrom's invention was first described in a printed publication and was first placed on sale by the publication in the February, 1971, edition of Sunset Magazine.

f. The February, 1971, Sunset ad was published before Mr. Bergstrom was ready to sell his product.

32. Mr. Bergstrom did not have suitable shipping cartons until mid-March of 1971. He had first purchased inexpensive used cartons in mid-January of 1971. However, Mr. Bergstrom concluded that these used cartons were commercially unsatisfactory and he never used them.

33. a. In connection with a new brochure to replace the unsatisfactory fact sheet, Mr. Bergstrom obtained the services

of an ad agency for professional help in preparing it and in getting additional publicity.

b. Mr. Bergstrom met with Kent Dixon of the Dixon Advertising Agency in the latter part of January, 1971. They immediately began work on a new mailing piece. Mr. Bergstrom prepared a general layout draft and he submitted it to Mr. Dixon around the early part of February, 1971.

c. The preparation of this new brochure took about three weeks, and it was completed on or about February 22, 1971.

34. Although he had completed his brochure by February 22, 1971, Mr. Bergstrom was still not completely ready to sell and ship the fireplace grate by that date. Before he shipped the first unit, Mr. Bergstrom wanted to obtain product liability insurance, which was of substantial concern to him, and to obtain his Minnesota Sales Tax permit. Mr. Bergstrom obtained his product liability insurance on or about February 27, 1971, and he paid for his Sales Tax permit on March 15, 1971.

35. As a result of the Sunset ad, Mr. Bergstrom received his first order on March 5, 1971, from one Charles Anderson. This order was shipped on March 17, 1971.

36. Kent Dixon also assisted Mr. Bergstrom in obtaining free publicity for his invention in a number of publications after the Sunset Magazine ad appeared. Mr. Dixon prepared a professional press release with all of the necessary glossy photographs. This press release was first sent out March 4, 1971.

37. On June 17, 1971, Mr. Bergstrom mailed his third letter to Peter Dryden, accompanied by a press release and two glossy photographs of the tubular fireplace grate. As a result of this effort, Mr. Bergstrom's submission was accepted for inclusion in a Parade of Progress column published on December 12, 1971.

38. Prior to December 14, 1970, no person other than Mr. Bergstrom possessed or used any of the patented fireplace grates or the prototypes of the grates.

39. a. Prototypes of the patented tubular fireplace grate were located in the recreational room in the basement of Mr. Bergstrom's house from April, 1970, through December 14, 1970. At that time Mr. Bergstrom's children were fourteen, thirteen, ten, and eight years of age. The children brought their guests to the rec. room.

b. The rec. room was not used to entertain anyone other than the children's guests and possibly some friends of Mr. and Mrs. Bergstrom from the time the tubular fireplace grate was reduced to practice in April, 1970, through December 14, 1970. No commercial visitors were brought to the rec. room during this period. Mr. Bergstrom's rec. room was not open and accessible to the public.

■ 40. Defendants argue that the rec. room was Mr. Bergstrom's place of business and therefore accessible to the public prior to the critical date because Mr. Bergstrom took business expense deductions on his 1970 tax return for expenses incurred in developing the tubular fireplace grate. The conclusion does not logically follow simply because Mr. Bergstrom characterized his development costs as business expenses. Mr. Bergstrom did not exhibit the fireplace grates to members of the public or prospective customers in his rec. room or anywhere else.

■ 41. Mr. Bergstrom never placed his patented fireplace grate in the hands of another prior to December 14, 1970, and the use of the patented fireplace grate was never available to a member of the public in an unrestricted way. The only possible disclosures of the patented fireplace grate prototype were incidental disclosures to casual adult visitors and to children who were present in his home for the purpose of visiting his own children and not of viewing the fireplace grate.

42. There is no evidence that Mr. Bergstrom sold, offered for sale, or ever attempted to sell a unit to any prospective purchaser during the period prior to December 14, 1970.

43. There is no evidence that the September fact sheet, or any other printed document showing the invention of the patent in suit, was placed in some public place, or was distributed to members of the public, during the period prior to December 14, 1970.

44. All of the activities of Mr. Bergstrom, prior to December 14, 1970, related to his preparations to publish and to place his invention on sale; the publication and placement of the invention on sale took place after December 14, 1970.

45. Mr. Bergstrom did not act in bad faith or with an intentional lack of candor in making his application to the Patent Office. However, it appears that some of the transactions and activities which occurred prior to the critical date may not have been brought to the attention of the patent examiner at the time the patent application was being considered.

46. Any Conclusions of Law, to the extent that they are deemed to be Findings of Fact, are incorporated into these Findings of Fact.

## MEMORANDUM AND CONCLUSIONS OF LAW

1. Any Findings of Fact, to the extent they are deemed to be Conclusions of Law, are incorporated into these Conclusions of Law.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338.

3. By agreement of the parties, the issue raised by defendants' counterclaim of whether or not the United States Design Patent No. 228,728 is invalid pursuant to 35 U.S.C. § 102(b), was severed for trial before the Court.

4. *Burden of Proof*

 The presumption of validity does not extend to those matters and transactions which were not before the patent examiner in the Patent Office at the time the patent application was being considered. "[T]he ultimate question of patentability is for the courts." *American Infra-Red Radiant Co.*

*v. Lambert Industries, Inc.*, 360 F.2d 977, 989 (8th Cir. 1966); *Continental Farm Equipment Co., Inc. v. Love Tractor, Inc.*, 199 F.2d 202 (8th Cir. 1952). Consequently, the appropriate burden for demonstrating the invalidity of the patent is the preponderance of the evidence, rather than the requirement of clear and convincing proof. *Futorian Manufacturing Corporation v. Dual Manufacturing & Engineering, Inc.*, 528 F.2d 941, 943 (1st Cir. 1976); *Dickstein v. Seventy Corporation*, 522 F.2d 1294, 1297 (6th Cir. 1975), *cert. denied*, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976). In applying the law to the evidence presented in this case, the Court has not relied on the presumption of validity, but has made a de novo consideration using the standard of the preponderance of the evidence.

5. 35 U.S.C.A. § 102 provides in pertinent part:

A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . .

6. Mr. Bergstrom's tubular fireplace grate described in U. S. Design Patent No. 228,728 was reduced to practice in April, 1970.

7. *Printed Publication*

 The parties are in general agreement that a printed publication within the meaning of 35 U.S.C. § 102(b) requires the invention to be described in a printed document which is accessible to the public more than one year prior to the date of publication. There is no serious dispute that the September, 1970, fact sheet was a printed document. The real controversy with respect to the printed publication bar of the statute centers around the meaning of "accessible to the public."

Defendants' position, that the fact sheet was available to the public, ignores the definition of its own expert, provided in a published article giving the meaning of the

terms "printed publication" and "accessible to the public," as well as the most recent law on the subject.

James B. Gambrell, Jr., Esq. was defendants' legal expert at trial. Robinson, recognized by Mr. Gambrell to be the grandfather of all texts on patent law, defines a publication within 35 U.S.C. § 102(b) as:
(1) A work of public character, intended for general use;
(2) Within reach of the public; . . .
ROBINSON, PATENTS § 325 (1890).

In his article on printed publications Mr. Gambrell comments,

[a]lthough this definition, when formulated, was ahead of its time, it stands today, by and large, as a succinct statement of what constitutes a *printed publication* within the meaning of the Patent Act. *What is a Printed Publication Within the Meaning of the Patent Act?* J. B. GAMBRELL, JR., JNL. of the PATENT OFFICE SOCIETY, at 395 (June, 1954).

Mr. Gambrell, in his article further sets forth Robinson's definition of printed publication:

A work of public character is such a book or other printed document as is intended and employed for the communication of ideas to persons in general, as distinguished from particular individuals. Private communications, although printed do not come under this description, whether designed for the use of single persons or of a few restricted groups of persons. Robinson, Patents § 326. GAMBRELL, J.P.O.S. at 395.

With respect to the meaning of "within reach of the public," Mr. Gambrell again cites Robinson's definition:

The publication must not only be intended for the public: it must have been actually published in such a manner that any one who chooses may avail himself of the information it contains. Robinson, Patents § 327. GAMBRELL, J.P.O.S. at 395.

The most recent decision reviewing the law of printed publication, of which defendants' expert was unaware at the time of trial, also adopts the above-cited definition of Robinson as setting forth the essential requisites for publication. *Application of Bayer*, 568 F.2d 1357, 196 U.S.P.Q. 670 (Ct. Cus. & Pat.App., 1978). The case involved a decision by the Patent and Trademark Office Board of Appeals that appellant's uncatalogued, unshelved thesis, which could be located in the library only by his graduate committee of three persons, constituted a printed publication. The Board's decision rested on the facts that the graduate committee members could have located the thesis due to their special knowledge of the title, subject matter and author. In addition, the Board reasoned that since there was no indication of a continued obligation of confidentiality, the members of the graduate committee could have transmitted the information necessary for obtaining the thesis to any number of people interested in the subject matter. *Id.*, 568 F.2d at 1359.

The Court of Customs and Patent Appeals found this reasoning to be incorrect and reversed, explaining:

From the foregoing authorities, we think it apparent that a printed document may qualify as a "publication" under 35 U.S.C. § 102(b), notwithstanding that accessibility thereto is restricted to a "part of the public," so long as accessibility is sufficient "to raise a presumption that the public concerned with the art would know of [the invention]." (citations omitted). Accessibility to appellant's thesis by the three members of the graduate committee under the circumstances of the present case does not raise such a presumption.

Moreover, since appellant's thesis could have been located in the university library only by one having been informed of its existence by the faculty committee, and not by means of the customary research aids available in the library, the "probability of public knowledge of the contents of the [thesis]," . . . was virtually nil. (citation omitted). *Application of Bayer*, 568 F.2d at 1361.

The facts before the Court provide an even more improbable case for the argu-

ment that members of the public ever had knowledge of or gained access to the September fact sheet or the two photographs of the grate. First, Mr. Dryden and Mr. Kelley did not receive the communications as general members of the public, but rather as an editor of a newspaper column and an advertising representative, respectively. Nor can these men be termed restricted members of the public concerned with the art. Rather, they are akin to the librarians and cataloguing staff personnel whose necessary contact with a thesis does not render it accessible to the public. The critical moment of accessibility to the public with respect to a thesis occurs when the thesis is catalogued with a temporary author slip. *Application of Bayer*, 568 F.2d at 1358. It does not occur when the library staff gains possession of the thesis.

Second, the photographs shown to Mr. Kelley were not left with him and therefore were not available to the public. The September fact sheet was not sent to him. But even if it had been, the storage files of Sunset Magazine are not accessible to the public at all. Likewise, the September fact sheets were not retrievable from Mr. Dryden. He did not even remember receiving them and consequently could not inform anyone of their existence. Moreover, the sheets were probably discarded shortly after receipt, since that was Dryden's practice with regard to most rejected submissions. In the event that the fact sheets were retained, they were kept in unindexed files in Mr. Dryden's home.

Accordingly, the Court concludes that there was no printed publication disclosing Mr. Bergstrom's tubular fireplace grate described in U. S. Design Patent No. 228,728 prior to the critical date of December 14, 1970.

### 8. On Sale

 In order for the invention to be deemed on sale one year prior to the application date, 1) the patentee must have a present intent to sell, and 2) that intent must be communicated to a prospective purchaser for the purpose of eliciting a sale, and not for some other reason. *See, e. g.,*

*Jack Winter, Inc. v. Koratron Company, Inc.*, 375 F.Supp. 1, 37 (N.D.Cal.1974). Mr. Bergstrom did not have an intention to sell his fireplace grate to Mr. Dryden or Mr. Kelley. In addition, he did not communicate with either one of them for the purpose of selling one of them a grate, but instead for the purpose of arranging a published write-up of his invention.

With respect to Mr. Dryden, Mr. Bergstrom did not intend to offer his grate for sale to Mr. Dryden, and Mr. Dryden testified that he did not consider the submission as an offer of sale to himself or to the magazine. With respect to Mr. Kelley, Mr. Bergstrom did not offer to sell him a fireplace grate, and Mr. Kelley testified that he did not recall that Mr. Bergstrom offered to sell him a unit and he did not ask to buy one. Furthermore, at the time of the communications, Mr. Bergstrom had only the one damaged prototype of the fireplace grate. He was not ready to sell his product to anyone until March 15, 1971.

*Johns-Manville Corp. v. Certain-Teed Corp.*, 196 U.S.P.Q. 152 (C.D.Cal.1977) and *Langsett v. Marmet Corp.*, 231 F.Supp. 759, 141 U.S.P.Q. 903 (W.D.Wis.1974) are not apposite to the factual situation before this Court. In both of those cases the patentee offered his invention for incorporation into working drawings or specifications prior to the critical date and in both instances the offers were accepted. Thus the offers were made to prospective purchasers with a present intent of eliciting an acceptance or sale. In the instant case, the information in the communications to Mr. Dryden and to Mr. Kelley was included for the purpose of effectuating future publications and not for making present offers of sale to either man.

Furthermore, there was no distribution of samples of the fireplace grate or offers to give a fireplace grate to Mr. Dryden, Mr. Kelley, or anyone else prior to the critical date. *See, e. g., Shelco, Inc. v. Dow Chemical Co.*, 446 F.2d 613, 173 U.S.P.Q. 451 (7th Cir. 1972), *cert. denied*, 409 S.Ct. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972); *Amphenol Corp. v. General Time Corp.*, 397 F.2d 431, 158 U.S.P.Q. 113 (7th Cir. 1968).

This Court concludes that the tubular fireplace grate was first offered for sale in the February, 1971, issue of Sunset Magazine. Consequently the grate which is the subject of U. S. Design Patent No. 228,728 was not placed on sale more than one year prior to the date of application.

### 9. *Public Use*

■ Private use of one's own invention is permissible. 35 U.S.C. § 102(b). "[A]n inventor may continue for more than a year to practice his invention for his private purposes or his own enjoyment and later patent it." *Metallizing Engineer. Co. v. Kenyon Bearing & A. P. Co.*, 153 F.2d 516, 520, 68 U.S.P.Q. 54 (2d Cir. 1946, L. Hand, C. J.), *cert. denied*, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946).

However, if the inventor places the invention in the hands of another without any restriction as to its use, without any control, without any condition of confidentiality, then any use to which the recipient places the invention is a public use within the bar of 35 U.S.C. § 102(b). *Thompson v. American Tobacco Co.*, 174 F.2d 773, 777–78, 81 U.S.P.Q. 323 (4th Cir. 1949).

Mr. Bergstrom did not place his invention in the hands of anyone prior to December 14, 1970. The fireplace grate was used in the fireplace of the recreational room of Mr. Bergstrom's home. Only the members of Mr. Bergstrom's family, the children of his friends, and possibly some adult guests were in the recreational room from April, 1970, through December 14, 1970. If these casual visitors saw the grate, which the evidence does not disclose, there is no indication whatsoever that they either understood its significance or were able to convey their visual observation of the grate to the public domain.

Furthermore, defendant's own legal expert, Mr. Gambrell, stated in his deposition that his opinion at that time was that the use of the grate in the basement fireplace was a private and not a public use:

. . . it certainly wasn't a typical public use in the sense it was in a public place as opposed to Mr. Bergstrom's home. . . . I would be inclined to treat it as a private use, and I would be surprised if Mr. Bergstrom's home was open willy-nilly to any member of the public who wants to walk in the front door.

Therefore, this Court concludes that the fireplace grate described in U. S. Design Patent No. 228,728 was not in public use prior to December 14, 1970. The first public use occurred after March 17, 1971, when the first unit was received by Mr. Bergstrom's first customer.

■ 10. United States Design Patent No. 228,728 is not invalid pursuant to the provisions of 35 U.S.C. § 102(b).

LET JUDGMENT BE ENTERED FOR PLAINTIFFS on defendants' counterclaim for a declaratory judgment of invalidity pursuant to 35 U.S.C. § 102(b).

IT IS SO ORDERED.